1

2   Anthony D. Prince (SBN # 202892)
    General Counsel, California Homeless Union
3   Law Offices of Anthony D. Prince
    2425 Prince Street, Ste. 100,
4   Berkeley CA, 94705
    Ph. 510-301-1472
5   Email: princelawoffices@yahoo.com

6
    Andrea M. Henson (SBN # 331898)
7   Where Do We Go
    2726 Martin Luther King Jr Way,
8   Berkeley, CA 94703-2146
    Phone: 510-999-9394
9   Email: ahenson@wdwg.org

10
    Attorneys for Plaintiffs/Petitioners
11

12                      UNITED STATES COURT

13              DISTRICT OF NORTHERN CALIFORNIA

14

15                                              Case No.:
    The CALIFORNIA HOMELESS
16  UNION/STATEWIDE ORGANIZING
    COUNCIL, on behalf of itself and its members;
17  FREMONT HOMELESS UNION, on behalf of       EX-PARTE APPLICATION and VERIFIED
    itself and its members; MARIN COUNTY        COMPLAINT FOR INJUNCTIVE RELIEF
18  HOMELESS UNION;MISSION PEAK                  for VIOLATIONS OF 42 USC § 1983, FIRST,
    UNITARIAN UNIVERSALIST                       FIFTH and FOURTEENTH AMENDMENT
19  CONGREGATION; FAITH IN ACTION               to the United States Constitution;
    EAST BAY; PAX CHRISTIE (FREMONT);           VIOLATION of the RELIGIOUS LAND USE
20  BRAIDED BRIDGE/HOMEBRIDGE                    AND INSTITUTIONALIZED PERSONS
    CONNECT; Fremont homeless community          ACT ("RLUIP"); RELIGIOUS FREEDOM
21  members KENT EATON; CORRINE                  RESTORATION ACT("RFRA");
    GRIFFITH; MICHAEL AUSTIN, MAURICE           CALIFORNIA CONSTITUTION, ART. I, § §
22  KING, PRODESTA HOFF, LACEY FRANKS,          I AND 7; AMERICANS WITH
    and all those similarly situated,            DISABILITIES ACT ("ADA") and for
23                                               DECLARATORY JUDGMENT FINDING
24                                               CITY OF FREMONT CODE CHAPTER 8.90
    Plaintiff,                                   et seq, 8.90.030 UNCONSTITUTIONAL
25                                               AND FACIALLY INVALID
    vs.
26

27  CITY OF FREMONT,

28  Defendant

## TABLE OF CONTENTS

INTRODUCTION………………………………………………………………………2

BACKGROUND AND STATEMENT OF FACTS……………………………………3

PARTIES……………………………………………………………………………..6

JURISDICTION AND VENUE……………………………………………………… 11

DIVISIONAL ASSIGNMENT…………………………………………………………12

STANDING FOR PRE-ENFORCEMENT CHALLENGE……………………………12

LEGAL STANDARD FOR INJUNCTIVE RELIEF…………………………………..16

SERIOUS QUESTIONS GOING TO THE MERITS…………………………………17

IMMIENT AND IRREPARABLE HARM……………………………………………18

BALANCE OF EQUITES TILTS SHARPLY TOWARD PLAINTIFFS………………19

PUBLIC INTEREST…………………………………………………………………20

CONCLUSION………………………………………………………………………21

LEGAL CLAIMS……………………………………………………………………21

PRAYER FOR RELIEF………………………………………………………………48

VERIFICATION………………………………………………………………………48

## TABLE OF AUTHORITIES

### FEDERAL CASES

*A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784 (9th Cir. 2006) ……………………………38

*Advocacy Ctr. v. Mink*, 332 F.3d 1101 (9th Cir. 2003) ...……………………………………………...13

*Alfred v City of Vallejo* 2:24-cv-03317-DC-SCR 999 (E.D. Feb. 7, 2025). ……….…..………17

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011))…..….………………16

*All. for the Wild Rockies v. Peña*, 865 F.3d 1211 (9th Cir. 2017)……...…..……………………17

*Am. Unites for Kids v. Rousseau*, 985 F.3d 1075 (9th Cir. 2021)……....……………………13

*Associated Gen. Contractors of Cal., Inc. v. Coal. of Econ. Equity*, 950 F.2d 1401 (9th Cir. 1991)
…………………………………………………………………………………………………18

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979)……………………………..12

*Bloom v. City of San Diego*, 2018 WL 9539238, at *3 (S.D. Cal.)………………………………28

*Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993)…………...………………………38

*Chambers v. Mun. Court*, 65 Cal. App. 3d 904 (1977)………….………………………..……41

*City of Grants Pass v. Johnson*, 144 S. Ct. 2202, 219 L. Ed. 2d 941 (2024)…………………………21

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988)……………………………37

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)……………..………………………………12

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984)………..………………………38

*Cooley v. City of Los Angeles*, 2019 WL 3766554, at *6 (C.D. Cal. Aug. 5, 2019)……………..28

*Coal. on Homelessness v. City & Cnty. of San Francisco*. 22-CV-05502-DMR, 2022 WL
17905114, at *20 (N.D. Cal. Dec. 23, 2022)...……………………………………………………..16

*Cuadra v. City of South San Francisco*, 2010 WL 55875, at *9 (N.D. Cal. Jan. 4, 2010) ……...43

*Cutter v. Wilkinson*, 544 U.S. 709 (2005)……………………………….....………………15,31

*Cuviello v. City of Vallejo*, 944 F.3d 816 (9th Cir. 2019)….………………………………….......41

*CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051 (E.D. Cal. 2009) aff'd, 348 F. App'x
288………………………………………………………….………………………………………19

*Desert Outdoor Adver., Inc. v. City of Moreno Valley*, 103 F.3d 814 (9th Cir. 1996)...............39

*Dulaney v. Mun. Court*, 11 Cal. 3d 77 (1974) ..........................................................................41

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235 (11th Cir. 2018)..35

*Frisby v. Schultz*, 487 U.S. 474 (1988).....................................................................................35

*Fulton v. City of Phila.*, 141 S. Ct. 1868, 210 L. Ed. 2d 137 (2021)....................................41

*Glendale Assocs., Ltd. v. NLRB*, 347 F.3d 1145 (9th Cir. 2003).......................................…..40

*Greene v. Solano Cnty. Jail*, 513 F.3d 982 (9th Cir. 2008).…....……..............................15, 30

*Grossman v. City of Portland*, 33 F.3d 1200 (9th Cir. 1994)...........…..............................34

*Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) ...........................34

*Harbor Missionary Church Corp. v. City of San Buenaventura*, 642 F. App'x 726 (9th

Cir.2016)...................................................................................................................15, 31

*Heflebower v. U.S. Bank Nat. Ass'n,* No. 1:13-cv-1121-LJO-MJS, 2013 WL 3864214, at *18
(E.D. Cal. July 23, 2013) ...........................................................................................…..19

*Holloman ex rel. Holloman v. Harland* , 370 F.3d 1252 (11th Cir. 2004)....................…....34

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977))...........................13

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.,* 515 U.S. 557 (1995)
.................................................................................................................................…...34

Int'l Soc'y for *Krishna Consciousness of Cal., Inc. v. City of Los Angeles*, 48 Cal. 4th 446, 456–
57 (2010)...................................................................................................................…........41

*Jeremiah*, 2018 WL 13675 41, *5 (9th Cir. 2009) ....................................................................21

*Kaahumanu v. Hawaii*, 682 F.3d 789 (9th Cir. 2012)..............................................................37, 39

*Kasky v. Nike, Inc.*, 27 Cal. 4th 939 (2002)...........................…........................................40

*Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006)…….....................................24

*Kincaid v. City of Fresno*, 2006 WL 3542732, at *35–37 (E.D. Cal. Dec. 8, 2006)..............43

*Lukumi Babalu Aye*, 508 U.S. 520 (1993), 533, 113 S.Ct. 2217.......................................41

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 138 S. Ct. 1719, 1730-32, 201
L.Ed.2d 35 (2018) .....................................................................................................41

*Martinez v. City of Fresno*, 1:22-cv-00307-DAD-SAB (E.D. Cal. May. 24, 2022)............39, 40

*McCullen v. Coakley*, 573 U.S. 464 (2014) …………………………………………………..39

*Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972)…………...…………………………..37

*Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) …………………….…..25, 26

*Plyler v. Doe*, 457 U.S. 202 (1982)…………………………………………………………………47

*Recycle for Change v. City of Oakland*, 856 F.3d 666, 670 (9th Cir. 2017)………………………..38

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 166 (2015) ………………………………………..35, 37

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 795 (1988)………………………39

*Sacramento Homeless Union et al v City of Sacramento et al* 2:22-cv-01095-TLN-KJN Dkt. No. 39 *(*August 3, 2023) …………………………………………………………………………………17

*Spence v. Washington*, 418 U.S. 405 (1974)…………………………………………………..34

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)….…...18

*Sinclair v. City of Seattle*, 61 F.4th 674 (9th Cir. 2023)…………………………………………22

*Texas v. Johnson* , 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)………………..36

*United Food & Comm. Workers Union Loc. 751 v. Brown Group, Inc.,* 517 U.S. 544 (1996). ...13

*United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). ………………..34

*U.S. v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989)………………………………...43

*United States v. O'Brien* , 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)………34

*United States v. Stevens*, 559 U.S. 460 (2010)…………………………………………………36

*United States v. Wheeler*, 254 U.S. 281 (1920)………………….…....…………………………..44

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ……………………………………………19

*Virginia v. Hicks*, 539 U.S. 113, 119 (2003)……..…………………………………………36

*Warner v. Village of Ruidoso*, 2013 WL 12329081, at *12 (D. N.M. Sept. 30, 2013) ………..…43

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)…….….……………....……………………..35

*W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.*, 862 F. Supp. 538 (D.D.C. 1994) ……………………………………………………………………………………………….…..31

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 ,449 n.6 (2008)…………..36.

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)……………………….…....…16, 17

**FEDERAL CODE**

42 U.S.C. § 1983............................................................................11, 34, 41, 42, 44

42 U.S.C. § 2000cc-3(g)...............................................................................15,31

42 U.S.C. § 2000cc- 5(7)(A)..........................................................................14, 30

42 U.S.C. § 12132.......................................................................................11, 27, 28

**FEDERAL REGULATIONS**

28 C.F.R. § 35.130 (b)(3)(ii)..............................................................................28

**FEDERAL RULES**

Fed.R.Civ.P. 65.........................................................................................16, 17

**CA CODE**

Cal. Gov. Code § 11135 ...................................................................................30

**OTHER AUTHORITIES**

Cal Crim 401, Judicial Council of California Criminal Jury Instructions (2024 edition)..........47

Chan J, Riley P, Aguirre R., (2023) SSM -Qualitative Research in Health, Volume 2, Dec.

2022.......................................................................................................24

**INTRODUCTION**

1.      On February 11, 2025, the City of Fremont, California took a page from one of the ugliest chapters of American history and made it a crime to help a person escape from the hunger, violence, dispossession and pursuit by law enforcement that characterizes the daily existence of that city's 600 homeless residents.

2.      By adding Chapter 8.90 to its municipal code, Fremont has made it a misdemeanor, punishable by six months in jail and a $1000 fine, for a person on public property to merely possess, without more, a tent, bedroll, tarp, sleeping bag or any other item deemed "camp paraphernalia." See Fremont Muni Code Chapter 8.90 et seq, 8.90.030. [See Exhibit A].

3.      To "Camp" is defined so broadly that it includes not only "plac[ing], pitch[ing] or occupying" tents, huts vehicles, vehicle camping outfits or temporary shelter but the act of "liv[ing] outdoors" without more. Even "[m]oving personal property [from one location on public property] to another location upon public property" is prohibited.

4.      Finally, in what has made nationwide headlines and provoked the most public condemnation, outrage and consternation – particularly from the faith community and charitable organizations across the board, is Section 8.90.060, that makes it a crime punishable by six months imprisonment and a $1,000 fine for "Any person causing, permitting, aiding, abetting or concealing" violations of the Ordinance. [1]

---

[1] There has been continuing unfavorable nation-wide media attention and widespread opposition and condemnation by churches, charitable organizations, housing advocates and service providers of Chapter 8.90, including Section 8.90.060 which imposes criminal sanctions for "aiding," "abetting" and "concealing" would-be violators of the Ordinance. Some are calling only for the removal of that part of the challenged Ordinance. However, even if that were to happen, overarching mandatory requirements set forth in Fremont Municipal Code Section applying to anything that the City makes unlawful. Fremont Municipal Code Section 1.10.040 which reads as follows: "Whenever in this code *any act* or omission is

5.      Two hundred years ago, by fleeing bondage, the runaway slaves, "stole"
themselves from their owners, and became, by definition, criminals. Today, it is the homeless
resident of Fremont who has become the criminal, "fleeing" from the cold of winter and extreme
heat of summer that takes the lives of thousands of the unsheltered every year; "fleeing" the
dangers of the unprotected streets and seeking refuge in a tent, car or under a freeway overpass;
fleeing hunger and want by taking the outstretched helping hands of the concerned and the
compassionate who, under this unconscionable enactment, have also been pushed into the ranks
of the hunted and the criminal.

## **BACKGROUND AND STATEMENT OF FACTS**

6.      In May 2024, the City of Fremont City Council ratified the Fremont
Homelessness Response Plan ("HRP"), a comprehensive plan for reducing homelessness in the
city. The HRP identified that "Based on the 2022 Alameda County Point-in-Time Count, the
number of people experiencing homelessness in Fremont increased by 69% from 2019, growing
from 608 to 1,026 people. This rate of growth was higher in Fremont than in Alameda County as
a whole, which saw a 22% growth rate during the same period. *Id.* The purpose of the Fremont
HRP is to offer "a roadmap for addressing homelessness through coordinated and data-driven
solutions that remove barriers to assistance, expand housing opportunities, and improve quality
of life throughout the community." *Id.*

made unlawful, it *shall include* causing, permitting, *aiding, abetting*, suffering, or *concealing* such act or
omission."
        It appears to Plaintiffs, therefore, that the inclusion of these words in the challenged ordinance
was not to restate what is already in the code, but to intimidate, chill and deter those who would otherwise
provide material support and survival items to the homeless.

7.      The HRP has three main goals to guide the City's strategy. First the City wants to "[s]top the growth of homelessness." *Id.* To do so they propose to "[e]liminate the 23% annual growth rate of people experiencing homelessness by reducing the number of people becoming homeless and increasing the number exiting to permanent housing." *Id.* Second, their goal is to "[i]ncrease pathways to housing. . . Double the proportion of people who are well served by the homeless response system, meaning that they are on pathways to housing, stay homeless less than a year, and do not exit services to unsheltered homelessness." *Id.* The last goal intends to "reduce the impact of unsheltered homelessness" by benefiting "those with and without permanent homes in Fremont by decreasing the number of people living in unsheltered conditions and the amount of City resources needed to manage encampment crises." *Id.*

8.      According to a Fremont City Council Report published on December 17, 2024 to support the passage of a new sweeping anti-homeless ban that is the subject of this lawsuit, Fremont admits that the HRP stated that encampment abatements do not solve homelessness. "The HRP acknowledges that enforcement, in and of itself, does not resolve individual instances of homelessness. Mitigation strategies in the HRP include a commitment to refining encampment response, inclusive of pairing service options with any additional regulations." Decl. Ex. at p. 1.

9.      At that same December 17, 2024 City Council meeting, the City Attorney Office and City Manager's Office Staff presented the findings and potential anti-camping ordinance. Importantly, the City Manager's Office was at variance with the HRP, correctly pointing out that funds allocated for preventing homelessness would have to be diverted to enforce the ordinance stating in the staff report:

> "If the Council determines that it will move forward with an anti-camping ordinance, staff would seek to reallocate and/or enhance associated services required to successfully implement the camping ban over time, including allocation of resources as described in the HRP intended to prevent and reduce

homelessness. An initial review of potential expenses and unmet needs that would be generated by implementing a citywide camping ban indicates that the City would need to consider allocating in excess of one million dollars in ongoing funding to address... Law enforcement via the addition or reassignment of community service officers and police officers to respond to encampment complaints...waste management" *Id.* at 2.

Staff further cautioned the City Council saying:

"Subject matter experts advise that enforcement activity (such as a camping ban) will not in and of itself reduce the overall number of homeless people in the City of Fremont. Encampments that are disbanded without an offer of alternative shelter will likely cause unhoused individuals to relocate nearby, potentially resolving concerns in one area of the City while generating new concerns at the relocation destination.

The City of Fremont's Homelessness Response Plan details the inverse relationship between costs associated with homelessness resolution and prevention and those associated with mitigation. The adoption of a camping ordinance would provide the City's enforcement staff with additional authority to respond to specific encampment complaints but is not expected to reduce overall homelessness in the City of Fremont without corresponding investment as outlined within the City Council's adopted Homelessness Response five-year plan. Encampment interventions that are accompanied by an offer of alternative shelter will be more effective and will lead to better community outcomes than encampment interventions that are not accompanied by the offer of alternative shelter." *Id.* at 3.

10. Disregarding the recommendations of the City Manager's Office, the City Council approved the ordinance without providing mitigating services consistent with City of Fremont's Homelessness Response Plan – approving the first reading of the anti-camping ordinance now challenged by Plaintiffs– and in so doing, effectively admitted that Chapter 8.90 would increase homelessness in the community by reducing funding for prevention services that were proven to reduce the number of unhoused, unsheltered persons and use it instead for conducting encampment abatements that "would not reduce homelessness".

11. On February 11, 2025, the City of Fremont passed the anti-camping ordinance under Chapter 8.90 of the Fremont Municipal Code. The ordinance imposes misdemeanor

penalties of up to $1,000 and up to six months in jail on anyone who "camp[s]" (including living outdoors) on "any public property," or anyone who "store[s]" personal property upon public property. Sec. 8.90.020 Sec. 8.90.030 Section 8.90.060.

12.    The Ordinance further states that "any person causing, permitting, aiding, abetting or concealing a violation of" this new anti-camping ordinance "shall be guilty of a misdemeanor, and may be prosecuted as a misdemeanor and upon conviction be subject to a fine not to exceed $1,000.00 or imprisonment in the city or county jail for a period of not more than six months, or by both such fine and imprisonment." (See, Exhibit A)

## PARTIES

**Plaintiffs**

13.    Plaintiff **CALIFORNIA HOMELESS UNION/STATEWIDE ORGANIZING COUNCIL ("CHU/SOC")** is the unincorporated parent federation of over two dozen local homeless unions, including local union plaintiff FREMONT HOMELESS UNION. CHU/SOC oversees, coordinates and provides material life-sustaining support – "Projects of Survival" – as well as communication, advocacy and, where possible, legal representation to thousands of its members and other unhoused and insecurely-housed families and individuals in encampments, streets, "safe" parking sites, shelters, vehicles, "transitional" and "supportive" housing and other circumstances resulting from the growing unaffordability and inaccessibility of traditional housing in California.

14.    CHU/SOC's mission is to provide a voice for this segment of the community that is routinely excluded from development and implementation of laws, ordinances, policies and practices that impact the unhoused directly. CHU/SOC has no staff, paid or unpaid.

15.    Plaintiff **FREMONT HOMELESS UNION** is a member union of the CHU/SOC housing-insecure families, individuals, and advocates, and is a member local of the California

Homeless Union/Statewide Organizing Council, affiliated with the National Union of the Homeless. The Union's mission is to organize, represent and serve the State's homeless community. Most of its officers and members live in homeless encampments.

16. Plaintiff **MISSION PEAK UNITARIAN UNIVERSALIST CONGREGATION** is a religious society in Fremont, California incorporated in the State of California in May of 1994. For over thirty years, the Congregation has pursued "religious living through worship, study, service and fellowship" including "acts that support our unhoused neighbors, including providing food and personal items, including clothing and hygiene supplies. "This Ordinance," writes Congregation President Elizabeth Schaefer, "criminalizes our Congregation members efforts to assist our unhoused neighbors."

17. Plaintiff **BRAIDED BRIDGE/HOME BRIDGE CONNECT,** is a faith-based, non-profit organization that works through local churches in many Bay Area Cities, including Fremont, as affordable housing advocates**.** Its activities and support are wide-ranging, including supplying food, clothing, items of protection from the weather and other necessities; connecting people to available services; being present at sweeps to support unhoused people struggling to move and relocating them to nearby spaces; creating advocacy art projects such as poster campaigns; speaking at schools, on panels and at conferences; seeking legal support; and offering regular restorative justice circles for processing the traumas of living unhoused and supporting people who are living unhoused.

18. Plaintiff **FAITH IN ACTION EAST BAY ("FIAEB")** is a faith-based membership organization that promotes justice around the issues that impact East Bay Communities, including the decriminalization of homelessness, access to affordable housing, excellent public schools, ending mass incarceration, civic engagement, and just immigration

policies to create family reunification. FIAEB multi-faith, multiracial network made up of more than 23 congregations that include over 25,000 people. Members of FIAEB as part of their work through FIAEB and its member congregations engage in direct mutual aid to unhoused people in Fremont, such as providing tents, tarps, food, water, and care packages that will be criminalized by the Fremont's new ordinance.

19.    Plaintiff **PAX CHRISTI NORTHERN CALIFORNIA ("PAX CHRISTI")** is a 50-year-old, faith-based membership organization located in Northern California whose members volunteer in the City of Fremont and provide direct aid to the homeless by providing tents, food, clothes, and other necessities. "Pax Christi" means "Peace Christ", is part of the Catholic Peace movement that emerged in opposition to the Vietnam War and the Cold-War arms race. Pax Christi seeks to build a culture of peace and nonviolence requires meaningful collaboration between clergy and laity, the leadership of young people, and nonviolence as a way of life.

20.    Plaintiff **KENT EATON ("MR. EATON")** is an unhoused man who lives in the City of Fremont and is a member of Fremont Homeless Union. He has experienced homelessness for the past 22 years and survives on $336 dollars a month from general assistance and $335 in food stamps. He lives in a tent that he has wrapped in a tarp to stay warm and protects him from the elements and outside harm. The tent and tarp were given to him by a church group. MR. EATON relies on a number of church groups that provide him with donations of food, water, tents, and blankets because he cannot afford these items himself. MR. EATON also lives next to and looks after his dear friend Corrine Griffith.

21.    Plaintiff **CORRINE GRIFFITH ("MS. GRIFFITH")** is a disabled woman who is homelessness in the City of Fremont and who suffers from multiple personality disorder and

PAGE 8

epilepsy. MS. GRIFFITH has an adult son, who is a local plumber and who regularly brings her

survival gear such as tents and tarps helping her survive. MS. GRIFFITH lost her housing and

became homeless when her housing manager embezzled her rent. She is trying desperately to get

into a homeless shelter. As a victim of violent crime, MS. GRIFFITH has been terrorized by an

East Bay street gang that is an affiliate organized crime syndicate that has been regularly

prosecuted for racketeering activities in the US Court for the Northern District of California

[Omitted here for safety]. This street gang murdered her husband and terrorized her and her

family. MS. GRIFFITH lives near her dear friend MR. EATON and other people in her

encampment to protect herself from prospective violence. Not long ago, MS. GRIFFITH also

suffered a catastrophic seizure that caused her heart to stop and she temporarily died. Thankfully

because she was in her encampment, her fellow unhoused neighbors, who look out for her, were

able to get her an ambulance which brought her to a hospital and resuscitated her. During her

death, MS. GRIFFITH had a religious experience that turned her into a "believer" – as part of

her religious conviction she helps her fellow neighbors with survival items – commonly sharing

survival gear like tents, tarps, food, and other necessities

    22.    Plaintiff **PRODESTA HOFF ("MS. HOFF")** is an unhoused women and

member of the Fremont Homeless Union. MS. HOFF is gainfully employed as a caregiver in the

City of Fremont. She lives in a tent within a camp of about a dozen other people, whom she

relies on to watch her things when she goes to her job. Besides working and striving to get into

housing, MS. HOFF is devoutly religious and as part of her faith regularly helps her neighbors in

her camp by sharing survival gear, tents, food, tarps, blankets, and other property necessary for

survival.

23.    Plaintiff **JOSÉ ARROYO ("MR. ARROYO")** is homelessness and is a member of the Fremont Homeless Union. MR. ARROYO is disabled. He was formerly a master technician until he suffered a traumatic head injury, making it impossible to hold down a job. He has been unhoused for the past two years. He relies on various churches that visit the camp and provide survival items like tents, tarps, blankets, food, and water. All of these items keep him alive, protected, and safe. MR. ARROYO lives in a tent in a large encampment in Fremont and engages in acts of reciprocity among his fellow unhoused neighbors, sharing with his campmates items like tarps, tents, and other survival gear.

24.    Plaintiff **MICHAEL AUSTIN ("MR. AUSTIN")** is a man who has been unhoused for the past five years while juggling multiple jobs as a handyman and working for a local air filter company. MR. AUSTIN lives in a tent and suffers from arthritis in his back. He manages his arthritis by sleeping on a spring mattress inside his tent to accommodate his disability and to be able to sleep comfortably. MR. AUSTIN also keeps an assortment of tools he uses for his employment. He assists his fellow neighbors with various tasks, and like everyone in the camp, share's survival gear and "camping paraphernalia".

25.    Plaintiff **LACEY FRANKS ("MS. FRANKS")** is a women experiencing homelessness who is a member of the Fremont Homeless Union.

26.    Plaintiff **MARIN COUNTY HOMELESS UNION is a chapter of the California Homeless Union and is an** is an unincorporated association of homeless and housing-insecure families, individuals and advocates. The Marin County Homeless Union is a member local of the California Homeless Union/Statewide Organizing Council, whose officers and members have conducted work providing aid to unhoused people in Fremont. Officers of the

PAGE10

Marin County Homeless Union have been organizing in the City of Fremont and providing direct mutual aid.

### Counsel:

Anthony D. Prince (SBN # 202892)
General Counsel, California Homeless Union
Law Offices of Anthony D. Prince
2425 Prince Street, Ste. 100
Berkeley CA, 94705
Ph. 510-301-1472
Email: princelawoffices@yahoo.com

Andrea M. Henson (SBN # 331898)
Where Do We Go
2726 Martin Luther King Jr Way
Berkeley, CA 94703-2146
Phone: 510-999-9394
Email: ahenson@wdwg.org

Defendant **City of Fremont** is a municipal corporation located in the County of Alameda that has passed its new anti-homeless law.

### Counsel:

Rafael E Alvarado Jr.,
City of Fremont, City Attorney's Office
3300 Capitol Ave., Building A Fremont, CA 94538

### JURISDICTION AND VENUE

27.    Jurisdiction is based on 28 U.S.C. Sections1331 and 1343. This case is brought pursuant to 42 U.S.C. Section 1983, 42 USC Section 12132, the Religious Land Use Institutionalized Persons Act "RLUIPA" 42 USC Section 2000 and raises questions of federal constitutional law under the Fourth and Fourteenth Amendments and federal statutes.

28.    The state law claims in this action are so related to the claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under

Article III of the United States Constitution. The Court's jurisdiction over these claims is invoked under 28 U.S.C. § 1367.

## DIVISIONAL ASSIGNMENT

29.     Because this action arises in Alameda County, it is assigned to the Oakland or San Francisco Division. Venue is proper in the Northern District in that the events and conduct complained of in this action are occurring in the Northern District.

## STANDING FOR PRE- ENFORCEMENT CHALLENGE

30.     "To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). The injury must not be "too speculative." *Id.* "A plaintiff need not, however, await an arrest or prosecution to have standing to challenge the constitutionality of a criminal statute." Rather, "[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

31.     In the instant case, Chapter 8.90 of the Fremont Municipal Code criminalizes conduct that for unsheltered homeless that is necessary for survival and involuntary. It also criminalizes reciprocal relationships, charity, and homeless outreach services for ALL PLAINTIFFS.

**INDIVIDUAL PLAINTIFFS**

32.     Unhoused plaintiffs MS. GRIFFITH, MS. HOFF, MS. FRANKS, MR. ARROYO, MR. AUSTIN, MR. EATON "INDIVIDUAL PLAINTIFFS", face immediate

criminal persecution under the ordinance because they are involuntarily homeless, and the ordinance criminalizes their possession of any type of property, including the survival gear such as blankets and tents which they need to survive by keeping their body temperature within a safe range.

33.    Furthermore, MS. GRIFFITH, MS. HOFF, MS. FRANKS, MR. ARROYO, MR. AUSTIN, MR. EATON and Members of the FREMONT HOMELESS UNION AND CALIFORNIA HOMELESS UNION face the interference of aid they receive from church groups, such as PAX CHRISTI, FIAEB, and the MARIN COUNTY HOMELESS UNION, which they rely on for survival gear, food, water, and other support that will be criminalized under FREMONT'S new ordinance.

**ORGANIZATIONAL STANDING**

34.    "The doctrine of associational standing permits an organization to 'sue to redress its members' injuries, even without a showing of injury to the association itself.'" *Or. Advocacy Ctr. v. Mink*, 332 F.3d 1101, 1109 (9th Cir. 2003) (quoting *United Food & Comm. Workers Union Loc. 751 v. Brown Group, Inc.*, 517 U.S. 544, 552 (1996)). An association has standing to sue on behalf of its members when: "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The third prong is a "judicially fashioned and prudentially imposed" question, as opposed to a constitutional requirement of standing. *Mink*, 322 F.3d at 1113 (citing *United Food & Comm. Workers Union Loc.*, 751, 517 U.S. at 557 ("[T]he third prong of the associational standing test is best seen as

focusing on these matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution.").

35.     Organizational Plaintiffs, CALIFORNIA HOMELESS UNION, FREMONT HOMELESS UNION and MARIN COUNTY HOMELESS UNION, have standing because they are legally permitted to sue on behalf of their members, including individually named Union membership including plaintiffs MS. GRIFFITH, MS. HOFF, MS. FRANKS, MR. ARROYO, MR. AUSTIN, MR. EATON and include unhoused people in the City of Fremont.

36.     FIAEB, PAX CHRISTI, MARIN COUNTY HOMELESS UNION, have organizational standing because their members have, and continue to intend to, assist unhoused people in the City of Fremont by providing food, water, tents, and other survival gear.

37.     Members of FIAEB, PAX CHRISTI, and MARIN COUNTY HOMELESS UNION will be subject to imprisonment for up to six months in jail for providing material aid to the homeless, because it will constitute aiding and abetting camping or engaging in storage on public property.

38.     FIAEB, PAX CHRISTI, MARIN COUNTY HOMELESS UNION intentionally provide material aid to help unhoused people to survive and know that they donate to unhoused individuals. These Plaintiffs know that unhoused individuals will use donated items for survival purposes, which constitute "camping" and "storage" on public property in violation of the FREMONT's new ordinance.

**STANDING UNDER RLUIPA**

39.     The Religious Land Use and Institutionalized Persons Act ("RLUIPA") broadly defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §2000cc- 5(7)(A). This definition is deliberately far-reaching, as evidenced by Congress' intent to distinguish RLUIPA "from traditional First

Amendment jurisprudence" by "expand[ing] the reach of the protection to include 'any religious exercise.'" *Greene v. Solano Cnty. Jail*, 513 F.3d 982,986 (9th Cir. 2008) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005)). Indeed, RLUIPA itself demands that it be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g). Consistent with this broad mandate, courts have routinely found that providing charity to homeless individuals-including by offering food and drink-can constitute "religious exercise" under RLUIPA. See, e.g., *Harbor Missionary Church Corp. v. City of San Buenaventura*, 642 F. App'x 726, 727-29 (9th Cir. 2016) (finding that the church's homeless ministry, which included offering food, was "an integral part of it religious exercise").

40.     These rulings are consistent with RLUIPA's legislative intent, which aims to protect organizations such as plaintiffs MISSION PEAK UNITARIAN UNIVERSALIST CHURCH, PAX CHRISTI OF FREMONT, BRAIDED BRIDGE, FAITH IN ACTION and other Fremont area religious orders that provide material support to the unhoused.

41.     Chapter 8.90 of the Fremont Ordinance is fundamentally a land use regulation that prohibits use of blankets, tents, tarps, and other similar items used for survival, and thermo-regulation of the body on public and private property. However, Unitarian Universalist of Mission Peak, Pax Christi, and Faith in Action East Bay also which share similar values – such as the Christian values of charity demanded by Jesus Christ. See Matthew 25:35-40 "For I was an hungry, and you gave me meat: I was thirsty, and you gave me drink: I was homeless and you sheltered me: I was naked, and you clothed me".

42.     Providing shelter, clothes, blankets, and food are fundamental religious practices for the members of Unitarian Universalist of Mission Peak, Pax Christi, and FIAEB. The

criminalization of that charity under 8.90.060 is a substantial burden because it abrogates their ability to engage in religious beliefs and traditions of charity.

## PLAINTIFFS SATISFY THE ELEMENTS REQUIRED FOR INJUNCTIVE RELIEF

### LEGAL STANDARD

43.    Federal Rule of Civil Procedure 65 governs temporary restraining orders. The standards for a temporary restraining order are the same as those for a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). In order to prevail, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

44.    "To establish a likelihood of success, plaintiffs need not conclusively prove their case or show that they are 'more likely than not' to prevail." *Coal. on Homelessness v. City & Cnty. of San Francisco.* 22-CV-05502-DMR, 2022 WL 17905114, at *20 (N.D. Cal. Dec. 23, 2022) (internal citations and quotations omitted) ("*Coalition*"). "Rather, a 'fair chance' of success is the standard for granting preliminary injunctive relief." *Id.* "The Ninth Circuit uses a sliding scale approach to preliminary injunctions, such that 'a stronger showing of one element may offset a weaker showing of another.'" *Id.* at *20 (citing and quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).

45.    "A temporary restraining order is an extraordinary and temporary "fix" that the court may issue without notice to the adverse party if, in an affidavit or verified complaint, the movant "clearly show[s] that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A)."

Quoting from *Sacramento Homeless Union et al v City of Sacramento et al* 2:22-cv-01095-TLN-KJN Dkt. No. 39 *(*August 3rd, 2023, Order GRANTING TRO).

46.     Under Federal Rule of Civil Procedure 65, the Court has the authority to issue a preliminary injunction. A party seeking such preliminary relief must meet one of two variants of the same standard. The traditional *Winter* standard requires the movant to show that (1) it "is likely to succeed on the merits;" (2) it "is likely to suffer irreparable harm in the absence of preliminary relief;" (3) "the balance of equities tips in [its] favor;" and (4) "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the "sliding scale" variant of the same standard, "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *All. for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017)

## SERIOUS QUESTIONS GOING TO THE MERITS

47.     "Serious questions" are questions that "'cannot be resolved one way or the other at the hearing on the injunction' because they require 'more deliberative investigation.'" (citation omitted). They "need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" (citation omitted)" *Alfred v City of Vallejo* 2:24-cv-03317-DC-SCR E.D. Feb. 7, 2025.

48.     Here, the City of Fremont has not and cannot dispute the dangers faced by the homeless as publicized currently and for years on its own website and by other means. Plaintiffs have raised serious questions regarding the impact of Chapter 8.90 on what will happen if Defendant City of Fremont deliberately disregards these known dangers and increases the risk of

physical and constitutional harm to Plaintiffs. Plaintiffs has raised serious questions going to the merits regarding the right to bodily integrity and substantive due process under the 14th Amendment, the Free Speech and Free Exercise clauses of the First Amendment, and, in additional to the Constitutional harms, the physical harm that unhoused plaintiffs will face if organizational plaintiffs HOMELESS UNION, MISSION PEAK CONGREGATION, PAX CHRISTI, BRAIDED BRIDGE and FAITH IN ACTION are deterred from and at risk of arrest and prosecution as aiders and abettors for performing their vital charitable support missions.

## IMMINENT AND IRREPARABLE HARM

49.     The Ninth Circuit has held that "[a]n alleged constitutional infringement will often alone constitute irreparable harm." *Associated Gen. Contractors of Cal., Inc. v. Coal. of Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (citation omitted). Plaintiff has established there are serious questions as to the merits of her Fourteenth Amendment claim that Defendant City's clearing of her shelter would violate her substantive due process rights under the state-created danger doctrine.

50.     INDIVIDUAL PLAINTIFFS and members of the FREMONT HOMELESS UNION face irreparable harm from the criminalization of having life sustaining conduct. Behaviors like using or possessing blankets, tents, tarps, and sleeping bags, become and offense punishable by up to six months in jail. Storing water and food, medications, and other "property" will immediately run afoul of the prohibition of storage of property on public property. Furthermore, using an "camping paraphernalia" on any private or public property will also result in incarceration.

51.     As is described in both the Declarations of Timothy Gholston RN., and Dr. Jamie Chang, PhD., FREMONTS anti homeless ordinance poses a major public health risk.

52.    For example, Mr. Gholston RN. Describes that the deprivation of blankets, tents, sleeping bags and other survival gear that keeps unhoused people warm at night or during inclement weather is medically necessary because chronic exposure to the cold result in cardiovascular impairment caused by the restriction of blood vessels throughout the body. This impairs the functioning of various organs in the body, resulting in cold related injury, illness, and premature death. These are foreseeable dangers that will occur to INDIVIDUAL PLAINTIFFS and MEMBERS OF THE FREMONT HOMELESS UNION.

53.    Dr. Chang, PhD who is a leading researcher on the impacts of the criminalization of homelessness also has presented comprehensive research that criminalization of homelessness causes premature mortality, sleep deprivation, increased rates violence against women, and other foreseeable dangers that will occur to INDIVIDUAL PLAINTIFFS and MEMBERS OF THE FREMONT HOMELESS UNION.

## THE BALANCE OF EQUITIES TILTS SHARPLY TOWARDS PLAINTIFFS

54.    "The purpose of preliminary injunctive relief is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined." *Heflebower v. U.S. Bank Nat. Ass'n,* No. 1:13-cv-1121-LJO-MJS, 2013 WL 3864214, at *18 (E.D. Cal. July 23, 2013) (citing *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981)). "A court balancing the equities will look to possible harm that could befall either party." *Jeremiah,* 2018 WL 1367541, *5 (citing *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009) aff'd, 348 F. App'x 288 (9th Cir. 2009)).

55.    The balance of equities and public interest tips sharply in Plaintiff's favor. First, FREMONT admits in its December 17th Staff Report that the anti-homeless ordinance will not

reduce homelessness, and will instead divert resources away from program that are should to reduce or prevent homelessness. Dr. Chang agrees with this but goes further to say "Anti-homeless ordinances such as those in Fremont are often justified on grounds that they will reduce homelessness in public spaces, increase public safety, reduce threats to public health, and/or push individuals into shelter or successful treatments. But research consistently shows that the enforcement of anti-homeless laws fails to deter the behaviors or sustainably accomplish these goals. Instead, social scientific consensus shows the opposite is true." Decl. Chang.

56.    Furthermore, on February 2nd, the County of Alameda Supervisor Elisa Marquez and Agency Director of Alameda County Health wrote to the City of Fremont as follows, in pertinent part:

> [W]e encourage the Council to consider the implications of potentially criminalizing homelessness. Studies indicate that policies addressing encampments, such as the proposed ordinance, have varied outcomes. While encampments can present health and safety concerns, there is substantial evidence that encampment bans do not improve community health or safety.
>
> Instead, an analysis by the Johns Hopkins Bloomberg School of Public Health found that involuntary displacement can disrupt access to healthcare, treatment, and social services, worsening health conditions for affected individuals. Research indicates that criminalizing camping does not reduce homelessness and an analysis of the impact of a similar ordinance found that most individuals displaced from encampments returned to unsheltered homelessness within a year. Studies have also shown that policies that criminalize behaviors and activities associated with unsheltered homelessness, including forcible displacement, can hinder an individuals' ability to secure housing and employment, exacerbating homelessness and associated health risks."
>
> We are concerned that the broad language within the proposed ordinance regarding "aiding, abetting, concealing, and permitting" those in encampments could inadvertently penalize health providers, aid workers, outreach teams, and others who deliver essential services and housing resources."

## PUBLIC INTEREST

57.    It is well-settled that the abrogation of constitutional rights belonging to any segment of the population offends the public interest. Here, moreover, as discussed above, the

City itself, by way of the Homeless Response Report approved by the City Council in May, 2024 has conceded that clearing encampments, the negative impact on the persons displaced thereby, and the diversion of funds that could otherwise go to services and pathways to housing are actions that not only do not *serve* the public interest, but are contrary to it.

## CONCLUSION

58.    Since the Supreme Court's decision in *Johnson v. Grants Pass*, dozens of cities across California, including the City of Fremont, have enacted new draconian laws and amended existing ordinances to intensify the displacement of the unhouse in many cases loudly and deceptively proclaiming that they have a green light, that "there are no more restrictions" to such measures. They are wrong.

59.    In *Grants Pass*, the Court held that constitutional challenges remain available to challenge such enactments on bases other than the Eighth Amendment including the First, Fourth and Fourteenth Amendments and statutes such as the Americans With Disabilities Act and, as plaintiffs assert in this complaint, laws offering increased protection for free exercise of religion.

60.    With the filing of this Complaint and Application for Preliminary Injunction, Plaintiffs urge the Court to walk down those constitutional pathways to provide the injunctive and declaratory relief necessary to prevent what will otherwise be a completely preventable humanitarian crisis in the City of Fremont.

## LEGAL CLAIMS

### FIRST CAUSE OF ACTION
### State-Created Danger
### (Fourteenth Amendment of the U.S. Constitution; 42 U.S.C. § 1983)

61.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

62.    The Ninth Circuit recognizes The Ninth Circuit recognizes a substantive due process claim where there is a "state created danger" - i.e., where a state actor '"affirmatively place[s] an individual in danger' by acting with 'deliberate indifference to [a] known or obvious danger in subjecting the plaintiff to it.'" *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006); see also id at 1061 (noting that state action affirmatively places a plaintiff in a position of danger "where state action creates or exposes an individual to a danger which he or she would not have otherwise faced).The doctrine also applies to ordinances passed by municipal entities *Sinclair v. City of Seattle*, 61 F.4th 674 (9th Cir. 2023).

63.    Under the Ordinance, unhoused people are prohibited from possessing blankets, tents, tarps, and other survival gear that is used to regulate the body's temperature and keep INDIVIDUAL PLAINTIFFS and members of the FREMONT HOMELESS UNION warm and dry.

64.    INDIVIDUAL PLAINTIFFS and members of the FREMONT HOMELESS UNION need blankets, tents, tarps and other survival gear that are medically necessary for survival because they keep the body warm and stabilize body temperature in order to maintain the function of the body's organs at night or during period of inclement weather.

65.    If INDIVIDUAL PLAINTIIFFS and members of the FREMONT HOMELESS UNION are deprived of their survival gear, they will experience cold related injury and premature reality because, as according to Registered Nurse Timothy Gholston, "Staying warm and dry is a biological necessity, because chronic cold causes cardiovascular impairment through persistent restriction of blood vessels throughout the body. Persistent cold impair the functions of the bodies organs, impairing their function, resulting in cold related injury, illness, and premature mortality.

66.     This is compounded by the fact that unhoused people often have complex disabilities and chronic conditions, which are doubly impaired by chronic cold that occurs either being unsheltered at night or during period inclement weather." See Decl. Gholston

67.     The general prohibition on survival gear necessary to regulate the body temperature of involuntarily homeless people posses a particularized harm to them, that is greater than the general population of Fremont who has access to indoor shelter.

68.     INDIVIDUAL PLAINTIFFS and members of the FREMONT HOMELESS UNION subject to constant abatement of their property – including the seizure and destruction of items necessary for survival such as tents, blankets, food, water, medications and constant abatement essentially constitute police raids against unhoused.

69.     The constant abatement of unhoused people through persistent police raids of their encampments is recognized as a common state created danger within the medical community that causes premature mortality among unhoused people.

70.     According to Dr. Chang, a UC Berkeley Professor who specializes in the health impacts of anti-homeless laws and criminalization, there are four primary factors that criminalization cause premature mortality among unhoused people. (1) Forced relocation and property seizures stripped people of health resources and necessities (e.g., personal belongings, social support) required to survive unhoused. (2) Abatements drove unhoused people into hazardous, isolated, less visible spaces, which increased health risks while reducing access to health outreach workers and support systems. (3) Abatement were the grounds for frequent negative encounters between unhoused people and authorities such as law enforcement - interactions that produced anger, stress, and distrust. (4) Abatements cause and criminalization of homelessness makes it unsafe for homeless people, particularly women, to seek out police

protection. This creates the necessity of self-policing in encampments which creates cycles of interpersonal violence that resulted in suffering, injury, and premature death. See Chan J, Riley P, Aguirre R., (2023)"Harms of encampment abatements on the health of unhoused people" SSM -Qualitative Research in Health, Volume 2, December 2022, Pages 100121 See Decl Dr. Chang.

71.    Under Fremont's municipal code, Homeless Union Members who take rudimentary precautions against the elements will be arrested and their property will be seized without a warrant.

72.    Under 8.90.040(a) "It is unlawful and a public nuisance for any person to store personal property, including camp paraphernalia, on any public property or any private property without the written consent of the owner, except as otherwise authorized in writing by the city."

73.    Under 8.90.060(a)(1)(2) Enforcement provision the City can seize any property of involuntarily homeless person after one initial advisement. After this initial advisement however, if a homeless person does not find private property they are considered to have "no removed their property" under 8.90.040(b)

74.    Under 8.90.060(a)(1)(2) states: Any person violating this chapter shall be subject to the following penalty: 1. Temporary seizure of personal property, as set forth at Section 8.90.040 of this chapter. 2. Prior to the city pursuing the remedy set forth at subsection (a)(1) of this section, the city shall provide the violator, orally or in writing, with information about housing support services. Nothing in this section or this chapter shall require the city to provide housing to such violator."

75.    Under 8.90.050 "The city manager may adopt procedures for the removal and recovery of personal property left upon lands where camping is prohibited. Absent such

procedures, personal property left upon lands where camping is prohibited for more than twenty-four hours may be removed by the city and may be recovered by the owner for up to ninety days.

76.    8.90.040(b) which states "Moving personal property to another location upon public property … shall not be considered to be removing the personal property from public property." Meaning that if the Homeless Union member without access to private property, will constantly be in a state of non-compliance after the initial advisement under 8.90.060(a)(2) – and is always subject to warrantless seizure of any personal property they own under 8.90.060(a)(1)

77.    Even if given notice, Homeless Union Members are constantly subject to seizure of their survival gear – and any temporary deprivation of their survival gear is potentially fatal. For example, an officer

78.    Fremont's municipal code exposes INDIVIDUAL PLAINTIFFS and FREMONT HOMELESS UNION MEMBERS to the seizure of their survival gear and arrests up to six months in jail for taking rudimentary precautions against the elements, or even just temporarily leaving any type of personal property anywhere in the City. It also prohibits basic assistance to their fellow unhoused people and neighbors through reciprocal acts of mutual aid such as sharing of blankets, tents, that are necessary for survival.

79.    Also importantly here, the State Created Danger Doctrine applies to state actors who cut off medically necessary services from people in the community. See *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) (Finding state created danger doctrine where "The officers examined Penilla, found him to be in grave need of medical care, cancelled the request for paramedics, broke the lock and door jam on the front door of Penilla's residence, moved him inside the house, locked the door, and left at approximately 11:30 a.m. The next day,

family members found Penilla dead on the floor inside the house. He died because of respiratory failure."

80.    Under Code 8.90.060, there is a broad prohibition against aiding and abetting homeless peoples camping – meaning as described above that homeless outreach workers, community volunteers, and other homeless people face a credible threat of prosecution with give a unhoused person or UNION MEMBERS a tent, blanket, sleeping bag or similar "camping paraphernalia", if the donor knows that the homeless person intends to use that blanket or sleeping bag for the purposes of sleeping on public or private property without the permission of the owner. In short, providing aid necessary for survival is a criminal offence. Similar during an abatement, helping an unhoused person move their property to another location or helping them re-set their tent is a criminal offense. All these activities are mutual aid and support necessary to avoid injury and pre-mature mortality caused by unsheltered homelessness.

81.    Here, the dangers presented in *Penilla* has been codified into an ordinance. The City of Fremont is cutting of unhoused people from material aid necessary for survival – frightening the people who aid their survival through charitable and reciprocal donation and forcing them to live in more isolated area farther away from police protection and medical aid from emergency survivors, and preventing organizations like PAX CHRISTI, FAITH IN ACTION EAST BAY, MARIN COUNTY HOMELESS UNION and other organizational plaintiffs from bringing in necessary survival gear to unhoused people, including INDIVIDUAL PLAINTIFFS and members of the FREMONT HOMELESS UNION.

82.    The City of Fremont understands that unhoused people are in a medically vulnerable state, dying 17.5 years sooner than their housed peers, and subject to pervasive obvious dangers of being homeless such as exposure to the elements, and exposure to crime.

Rather than providing the medically necessary support to stop premature mortality the City of Fremont is creating a prosecutorial framework to exacerbate these known dangers and expedite the premature death of unhoused people within the City of Fremont – including members of the California Homeless Union.

## SECOND CAUSE OF ACTION
### State-Created Danger
### (Article I, Section 7 of the California Constitution)

83.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

84.     Governmental action that affirmatively places a person in a position of danger deprives that person of substantive due process rights guaranteed by the California Constitution. Cal. Const., Art. I, § 7(a). The substantive due process protections under the California Constitution are at least as expansive as those under the U.S. Constitution.

85.     Defendants' policy, custom, and practice of removing unhoused people from public spaces and of seizing and destroying their personal property, such as tents and other survival gear, endangers the health and safety of unhoused people in a way that shocks the conscience. Defendants know or should know that their actions endanger the health and safety of unhoused individuals.

86.     Defendants' policies and practices have and will continue to put Individual Plaintiffs, and a substantial number of unhoused individuals served by Plaintiffs, in immediate danger in violation of their substantive due process rights under the California Constitution.

## THIRD CAUSE OF ACTION
### Violation of the Title II of the Americans with Disabilities Act of 1990
### (42 U.S.C. § 12132)

87.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

88.    Title II of the Americans with Disabilities Act (ADA) provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Discrimination under Title II of the ADA includes administration of programs in a way that has a discriminatory effect on people with disabilities, or that has the "effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." 28 C.F.R. § 35.130 (b)(3)(ii).

89.    A local government's removal of homeless individuals and their possessions from public property—as well as the provision of services or shelter to unhoused individuals—are programs, services, and/or activities covered by Title II of the ADA. Failure to provide proper assistance, additional time, or other supports to disabled individuals when demanding that unhoused people remove themselves or their belongings from public space is a violation of the ADA. See *Cooley v. City of Los Angeles*, 2019 WL 3766554, at *6 (C.D. Cal. Aug. 5, 2019) ("Cooley […] told LAPD officers that she needed help to carry her property because of her disability and that she lost most of her essential property because her needs were not accommodated […] the City's practices, even if it facially neutral, violate the ADA by unduly burdening people with disabilities such as Cooley").

90.    Failing to provide shelter options to unhoused people that meet their disability needs is also a violation of the ADA—as it means that shelter is functionally unavailable to them because of their disability. See *Bloom v. City of San Diego*, 2018 WL 9539238, at *3 (S.D. Cal.

June 8, 2018) ("[B]ecause of plaintiffs' disabilities, they cannot seek housing in a homeless shelter because the shelters cannot accommodate their disabilities; . . . the shelters are 'functionally unavailable' to them").

91.     Defendants discriminate against unhoused individuals by failing to provide adequate notice, time, and assistance to unhoused people with disabilities who are forced to move themselves or their belongings from public space in response to Defendants' homeless sweeps.

92.     Defendants further discriminate against unhoused individuals with disabilities by arresting, citing, fining, and seizing the property of unhoused people for sleeping or lodging in public without first identifying their individualized needs and whether Defendants' shelter options, if any exist, can actually meet those needs.

93.     Forcibly removing unhoused residents without first identifying and offering alternative shelter or services that meet the individualized needs of people with disabilities does not serve any sufficiently compelling or bona fide and legitimate interest of Defendants, and less discriminatory options are available to Defendants to achieve any interests they claim they are trying to advance.

94.     MS. GRIFFITH, MR. ARROYO, and a significant number of unhoused individuals served by Plaintiffs, have physical or mental disabilities and will be injured by Defendants' discriminatory response to unhoused residents.

### FOURTH CAUSE ACTION
### Discrimination Against Persons With Disabilities
### (Under Cal. Gov. Code § 11135)

95.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

96.     Cal. Gov. Code § 11135 is intended to prohibit all forms of discrimination prohibited under Title II of the Americans with Disabilities Act and, where possible, to be more protective of people with disabilities. *See* Cal. Gov. Code § 11135(b).

97.     By administering its programs for unhoused people and response to homelessness in a manner that has a discriminatory effect on people with disabilities, Defendants will violate, and continue to violate, Section 11135.

98.     MS. GRIFFITH, MR. ARROYO, and a significant number of unhoused individuals served by Plaintiffs, have physical or mental disabilities and have been injured by Defendants' discriminatory response to unhoused residents with disabilities.

**FIFTH CAUSE OF ACTION**
**Violation of the Religious Land Use Institutionalized Persons Act "RLUIPA"**
**(42 USC § 2000)**

99.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

100.    RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution" unless the government demonstrates that the imposition of that burden is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc(a)(1).

101.    RLUIPA broadly defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). This definition is deliberately far-reaching, as evidenced by Congress' intent to distinguish RLUIPA "from traditional First Amendment jurisprudence" by "expand[ing] the reach of the protection to include 'any religious exercise.'" *Greene v. Solano Cnty. Jail*, 513 F.3d

982, 986 (9th Cir. 2008) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005)). Indeed, RLUIPA itself demands that it be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).

102.    Consistent with this broad mandate, courts have routinely found that providing charity to homeless individuals—including by offering food and drink—can constitute "religious exercise" under RLUIPA. See, e.g., *Harbor Missionary Church Corp. v. City of San Buenaventura*, 642 F. App'x 726, 727-29 (9th Cir. 2016) (finding that the church's homeless ministry, which included offering food, was "an integral part of its religious exercise; see also *W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.*, 862 F. Supp. 538, 544 (D.D.C. 1994) (noting that, in the Religious Freedom Restoration Act context, the "concept of acts of charity as an essential part of religious worship is a central tenet of all major religions," including by providing "clothing for the naked, food for the hungry, and benevolence to the needy") (emphasis added).

103.    PLAINTIFF FIAEB is a multi-faith membership-based organization composed of 23 congregations and over 25,000 individual members who include Christian, Muslim, Jewish, Buddhist, Hindu, Bahai, and other faiths.

104.    PLAINTIFFS MS. HOFF and MS. GRIFFITH are both unhoused women, who also engage in religiously motivated charity towards their fellow unhoused people who live in their encampment.

105.    Plaintiffs FIAEB, PAX CHRISTI, MS. HOFF, and MS. GRIFFITH engage in acts of charity on land owned by the CITY OF FREMONT, or on private property located in

Fremont, including providing donations of food, water, tents, blankets, tarps, and other necessities for survival, which is mandated by their sincerely held beliefs.

106.    FREMONT's new anti-homeless ordinance is a land use regulation, because it regulates land use of both public and private property within the CITY OF FREMONT.

107.    FIAEB and PAX CHRISI members and ministerial duties, as well as MS. HOFF and MS. GRIFFITH face criminal prosecution of engaging in religiously motivated acts of charity as mandated by their members faith.

108.    This criminalization of charity will be substantially burdened because the CITY OF FREMONT imposes criminal penalties, up to six months in jail, against people who knowingly provide aid to homeless individuals who engage in survival activities that violate Chapter 8.90.

109.    Furthermore, PAX CHRISTI and FAITH IN ACTION EAST BAY are both 501c(3) non-profits, and could face a direct threat to their tax status, if its found that their funding is used for the "criminal" activity of aiding the homeless.

110.    FREMONT's anti-homeless ordinance does further a substantial government interest, because it does not alleviate homelessness. Indeed, the County of Alameda and major government contractors who provide homeless services, face the threat of incarceration.

111.    FREMONT'S anti-homeless ordinance is not the least restrictive means for addressing issues like illegal dumping, because the City of Fremont's own Homelessness Response Plan has outlined ways to alleviate the impacts of homeless encampments, including weekly trash services at encampments and providing unhoused people trash cans to manage garbage, as well as reasonable regulations about the size and spacing of encampments – all of which the CITY OF FREMONT has implemented.

1

2

3

4

5

**SIXTH CAUSE OF ACTION**
**Violation of the Religious Freedom Restoration Act**
**42 U.S.C. § 2000bb**

112.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

6

7

8

9

10

11

12

13

14

15

16

17

113.    Under Religious Freedom Restoration Act ("RFRA"), the federal government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government demonstrates that the burden is "the least restrictive means of furthering [a] compelling governmental interest." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 & n.2 (2014) (quoting 42 U.S.C. § 2000bb-1(a), (b)). The First Amendment similarly prohibits government interference in the freedom of expressive association—including association for the purpose of engaging with others in protected religious exercise, speech, or peaceable assembly—unless the government can show its conduct serves "compelling state interests . . . that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

18

19

20

21

22

23

24

114.    Any "person whose religious exercise has been burdened in violation of" RFRA "may assert that violation as a claim . . . in a judicial proceeding" and "obtain appropriate relief" against the government. 42 U.S.C. § 2000bb-1(c). As denominational bodies and nonprofit associations of churches, synagogues, pastors, and rabbis, Plaintiffs are "persons" within the meaning of RFRA. *See Hobby Lobby*, 573 U.S. at 707–08 (recognizing that churches and nonprofits, as well as closely held corporations, constitute "persons" under RFRA).

25

26

27

28

115.    Here, Plaintiffs MISSION PEAK CONGREGATION, FIAEB, PAX CHRISTIE and other Plaintiffs that exercise their faith by providing charitable actions, including providing tents, blankets, clothing, hygiene products and other survival items are harmed and deterred by the threat of arrest as aiders and abettors of under the challenged ordinance.

## SEVENTH CAUSE OF ACTION
### Violation of Freedom of Speech and Assembly
### (First and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983)

116.    PLAINTIFFS reincorporate the preceding paragraphs as if fully set forth herein.

117.    Chapter 8.90 of Fremont's Code applies to "'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks." *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). Such places "are considered, without more, to be 'public forums.'" Id.; *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) ("[S]treets and parks . . . have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Grossman v. City of Portland*, 33 F.3d 1200, 1204 (9th Cir. 1994) (describing public parks as "the quintessential public forums" (internal quotation marks and citation omitted)).

118.    Constitutional protection for freedom of speech "does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). The First Amendment guarantees "all people [ ] the right to engage not only in 'pure speech,' but 'expressive conduct' as well." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (citing *United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ). Moreover, "a narrow, succinctly articulable message is not a condition of constitutional protection" because "if confined to expressions conveying a 'particularized message' [the First Amendment] would never reach the unquestionably shielded painting of Jackson Pollack, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc., 515 U.S. 557 (1995)* citing *Spence*, 418 U.S. at 411, 94 S.Ct. 2727 ).

PAGE34

119.    In considering charitable donations and mutual aid to and amongst the homeless, courts have found that donating and sharing of the necessities of survival constitutes expressive conduct. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,* 901 F.3d 1235 (11th Cir. 2018).

120.    Chapter 8.90 criminalizes expressive conduct and religious exercise that is aimed at censoring content-specific conduct that includes giving aid and succor to the homeless, in order to chill the expression that speech and cause members to reasonably fear criminal prosecution for bringing tents, blankets, and other aid.

121.    The Fremont ordinance is an unconstitutional content-based regulation of speech and expression because although facially content neutral, the Ordinance was adopted for a content-based purpose: the City's "disagreement" or disapproval with the ideas expressed by homeless individuals, encampments, advocates' and representatives' exercising their First Amendment speech, religious and political expression, associational rights, including the right to protest, observe City officials, provide "camp paraphernalia" such as survival gear, food, and assisting with "camp" and "Camp facilities" by providing protective structures like tents and tarps for the homeless to survive.  See *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 166, 164 (2015) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

122.    The Fremont Ordinance Sec. 8.90.030 states that "[i]t is unlawful for any person to camp or maintain an encampment in or upon any public property such as public ways, sidewalks, and streets." Even more troubling is the definition of "Camp" set forth in the ordinance. "'Camp' means to place, pitch or occupy camp facilities; *to live* temporarily in a camp facility *or* outdoors; or to use camp paraphernalia." (Emphasis added.) The word "or" may be used as either a disjunctive or a conjunctive between two separate clauses. Here, either

interpretation clearly indicates that the challenged ordinance makes it illegal not only to live in a camp facility but equally criminal to simply live outdoors, period.

123.    In a facial challenge to an enactment's validity under the First Amendment, the "law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). Here, the City specifically uses the term "camping" as pretext to target all "homeless" speech and expression in public spaces and to selectively enforce against all individuals helping the homeless survive. Lastly, Homeless individuals living anywhere outdoors and in any public spaces will be punished with punitive measures.

124.    Moreover, the overbreadth doctrine exists "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech— especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

125.    Fremont's overbroad statute that criminally punishes the charitable acts of others to include churches, nonprofits, individuals, and the homeless themselves will chill and deter their speech. In Sec. 8.90.060 (b)(1) of the Fremont Anti-Camping law "Any person causing, permitting, aiding, abetting or concealing a violation of this chapter shall be guilty of a misdemeanor."

126.    While the City publicly denies that the ordinance "does not prohibit the provision of aid and services" and that "a person that provides food, water, blankets, tents, a tent or clothing to another person would not violate the terms of the camping ordinance or would that constitute aiding and abetting. In fact, the plain language of the ordinance expressly states

otherwise. For example, under Sec. 8.90.020(c) "'Camp paraphernalia' includes, but is not limited to, bedrolls, tarpaulins, cots, beds, sleeping bags, hammocks or cooking facilities and similar equipment."

127.    Thus, the provision of these items as an expression of one's religious or political beliefs can subject individuals (to include charities, homeless neighbors, local residents, churches, and others) exposure to citation and arrest. These criminal penalties have already had the effect of deterring and chilling the Constitutional speech of the plaintiffs who are threatened by the government to stop engaging in expressive or religious conduct such as acts of charity toward the homeless.

128.    Additionally, "the Supreme Court and the Ninth Circuit have repeatedly allowed facial attacks premised on the grant of unbridled discretion to a licensing official." *Kaahumanu v. Hawaii*, 682 F.3d 789, 802 (9th Cir. 2012) (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988)). While the ordinance states that the City shall exercise its discretion to enforce this ordinance, the enforcement outcomes for protected speech are solely left to the local law enforcement officer.

129.    Under the First Amendment, a government like the City of Fremont "has no power to restrict expression because of its message, its idea, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). "Government regulation of speech is content based if a law applies to a particular speech because of the topic discussed or the idea or message expressed." *Id.*

130.    To determine whether a law is content based, i.e., a law that targets speech on its communicative content, courts consider "whether a regulation of speech 'on its face' draws

distinctions based on the message a speaker conveys." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 670 (9th Cir. 2017) (citing *Reed*, 576 U.S. at 163). "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification or lack of 'animus toward the idea contained' in the regulated speech." *Reed*, 576 U.S. at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).

131.    Courts consider whether a law is content based or content neutral "on its face before turning to the law's justification or purpose," because a government's assertion of "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Reed*, 576 U.S. at 167.

132.    "[T]he appropriate level of scrutiny is initially tied to whether the statute distinguishes between prohibited and permitted speech on the basis of content." *Frisby v. Schultz*, 487 U.S. 474, 481 (1988). Content-based laws are "presumptively unconstitutional." *Reed*, 576 U.S. at 163. To overcome this presumption, a content-based law must survive strict scrutiny, which requires the government to prove that the content-based law is "narrowly tailored to serve compelling state interests." *Id.*

133.    Even if the considered content-neutral, the Ordinance violates the First Amendment as an unreasonable time, place, and manner restriction that impermissibly burdens protected speech, expression, and associational rights in a public forum. Restrictions on speech (reasonable time, place, and manner restrictions that are justified without reference to the protected speech's content) must be "narrowly tailored to serve a significant government interest, leaving open ample alternative channels of expression." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 792 (9th Cir. 2006) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). This tailoring requirement guards not only against "an impermissible desire to

censor" based on disagreeable content but also against a government conveniently silencing speech as "the path of least resistance" in addressing associated problems. *McCullen*, 573 U.S. at 486. "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *Id.* (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 795 (1988)). The Ordinance fails to satisfy these requirements. By prohibiting all individuals from engaging in charitable acts, creating criminal punishment and penalties for all acts of charity that assist with survival in traditional public forums such as parks and sidewalks, the Ordinance delegates overly broad discretion to law enforcement. The Ordinance is not narrowly tailored because it burdens substantially more speech, expressive conduct, and association than necessary and does not leave open channels for expression.

134.    Under the prior restraint doctrine, "a law cannot condition the free exercise of First Amendment rights on the unbridled discretion of government officials." *Desert Outdoor Adver., Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996) (internal quotation marks, citation omitted). The Ordinance is an unconstitutional prior restraint because now every person entering a homeless encampment or assisting with survival of homeless individuals is subject to enforcement by law enforcement, abatement officers, and other city workers and contractors vested with sweeping discretion to arbitrarily anticipate and suppress speech, expression, and associational rights. Such limitless discretion inherently creates an unacceptable risk of viewpoint discrimination, regardless of whether or how it is in fact exercised. *Kaahumanu,* 682 F.3d at 806.

135.    This case is similar to *Martinez v. City of Fresno*, 1:22-cv-00307-DAD-SAB (E.D. Cal. May. 24, 2022), where the central issue was whether an ordinance regulating the

behavior of unhoused individuals and their advocates violated First Amendment rights. In *Martinez*, the court ruled that the ordinance was likely unconstitutional due to its overbreadth and vagueness. The Ordinance's broad language allowed for excessive restrictions on speech and conduct, effectively silencing government criticism by displacing unhoused people from public view and hindering advocates and the press from engaging with them or drawing attention to homelessness issues. To prevent this infringement on free speech, the court issued a preliminary injunction, halting enforcement of the ordinance while the legal challenges were considered.

136.    Here, what the City of Fresno unsuccessfully sought to accomplish with yellow police tape the City of Fremont aims to achieve by threat of arrest. The constitutional violation is the same in either case.

## EIGHTH CAUSE OF ACTION
### Violation of Freedom of Speech and Assembly
### (Article I, Sections 2 and 3 of the California Constitution)

137.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

138.    The California Constitution, Article I, section 2 prohibits laws that "restrain or abridge liberty of speech or press." The liberty of speech provision in California's Constitution "is at least as broad as and in some way is broader than the comparable provision of the federal Constitution's First Amendment." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 958–59 (2002) (internal quotation marks, citations omitted). The California Constitution, Article I, section 3 protects the right to "assemble freely to consult for the common good."

139.    The standards for evaluating whether a regulation is content based and whether a content-based regulation is constitutional are similar under federal and state law. See *Glendale Assocs., Ltd. v. NLRB*, 347 F.3d 1145, 1155–56 (9th Cir. 2003).

140.    The standard for evaluating time, place, and manner restrictions on protected

speech and assembly rights in a public forum is similar under federal and state law. *Cuviello v.*

*City of Vallejo*, 944 F.3d 816, 827 (9th Cir. 2019) (citing *Dulaney v. Mun. Court*, 11 Cal. 3d 77,

84–85 (1974)); *Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of Los Angeles*, 48 Cal.

4th 446, 456–57 (2010)) (freedom of speech); *Chambers v. Mun. Court*, 65 Cal. App. 3d 904,

908 (1977) (right to freely assemble and associate).

141.    The City of Fremont is violating or imminently will violate Article I, sections 2

and 3 of the California Constitution by enforcing the Ordinance against protected speech,

expressive conduct, and association.

**NINTH CAUSE OF ACTION**
**Violation of the free exercise of religion**
**(First and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983)**

142.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as

though fully set forth herein.

143.    "Government fails to act neutrally when it proceeds in a manner intolerant of

religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Phila.*,

141 S. Ct. 1868, 210 L. Ed. 2d 137 (2021) (first citing *Masterpiece Cakeshop, Ltd. v. Colo. C.R.*

*Comm'n*, 584 U.S. 617, 138 S. Ct. 1719, 1730-32, 201 L.Ed.2d 35 (2018) (holding an

adjudicatory body of the Colorado Civil Rights Commission failed to act neutrally in an

administrative proceeding when it demonstrated "hostility" towards a bake shop owner's

religiously-grounded opposition to same-sex marriage); then citing *Lukumi Babalu Aye*, 508 U.S.

at 533, 113 S.Ct. 2217 (holding that a city ordinance lacked neutrality and targeted the Santeria

religion where it effectively prohibited any killing of animals for the purpose of Santeria ritual

PAGE 41

sacrifice but ensured "killings that are no more necessary or humane in almost all other circumstances are unpunished")).

144.    Here, 8.90.060 is content based because it is based "depend entirely on the communicative content" *Reed*, 576 U.S. at 164-165, 135 S.Ct. 2218. Fremont Municipal Code Chapter 8.90.060(a)(1) criminalizes donations of survival items to people who are homeless, when donor knows the intended beneficiary is homeless, and that the beneficiary intends to use the donated survival gear to violate the ordinance, which they invariably will (See *California Criminal Jury Instructions 401*, Aiding and Abetting). At the same time, 8.90.060(a)(1) permits a donor to give identical items to a beneficiary who is not homeless, and they believe the beneficiary will not use the items to violate the ordinance. *Id.*

145.    In short, 8.90.060(a)(1) strictly prohibits the Judeo-Christian duties towards the poor. It is unlawful to "provide the poor wanderer with shelter" (Isaiah 58:7), or clothing the naked, and feeding the hungry, (Matthew 25:35-40) if these donations are knowingly given to the homeless people who invariably use donated goods to violate Chapter 8.90.

146.    However, it is fine to give identical items to the rich who own homes. If the intended beneficiary can keep their tents, blankets tents, cooking facility, and other "camping paraphernalia" in their house or garage the doner will not experience prosecution for aiding and abetting under 8.90.060.

## TENTH CAUSE OF ACTION
### Violation of Fourth Amendment protection against unreasonable search and seizure
### (Fourth Amendment; 42 U.S.C. § 1983)

147.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

148.    The Fourth Amendment to the U.S. Constitution protects against all unreasonable searches and seizures. U.S. Const. amend. IV. The Fourth Amendment also specifically protects

individuals from being arrested or having their property searched and seized by law enforcement without probable cause that a crime has been committed. *See, e.g., Kincaid v. City of Fresno*, 2006 WL 3542732, at \*35–37 (E.D. Cal. Dec. 8, 2006) ("The City's seizure of homeless people's personal property without probable cause […] violates the Fourth Amendment to the United States Constitution").

149.    Similarly, government officials can only detain or make an investigatory stop if they are aware of "specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that the particular person detained is engaged in criminal activity." *U.S. v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989).

150.    Where enforcement of a law has already been determined to be patently unconstitutional, however, there can be no reasonable suspicion or probable cause to investigate a violation of the law. *See Cuadra v. City of South San Francisco*, 2010 WL 55875, at \*9 (N.D. Cal. Jan. 4, 2010) ("there was no probable cause to arrest [plaintiff] for breaking a law that had already been held unconstitutional"); *Warner v. Village of Ruidoso*, 2013 WL 12329081, at \*12 (D. N.M. Sept. 30, 2013) ("state courts have already held that the Village Ordinance was patently unconstitutional, which supports his contention that no probable cause existed for issuing the violations of these laws.

151.    Individual Plaintiffs and others living unsheltered in the City of Fremont, including many unhoused people served by Plaintiffs, will be subject to investigatory stops, searches, property seizures, arrests, "move along" orders and warnings pursuant to anti-lodging and sleeping laws without probable cause or reasonable suspicion. Religious groups, nonprofits, and individual plaintiffs will live under constant and imminent threat of being subject to these unconstitutional searches and seizures.

### ELEVENTH CAUSE OF ACTION
**No Probable Cause: Unreasonable Search and Seizure**
**(Under Article I, § 13 of the California Constitution)**

152.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

153.    By making it illegal to possess items of personal property necessary for survival, now classified essentially as contraband, belonging to plaintiffs, the challenged ordinance authorizes seizure and, in some cases, destruction of personal property belonging to plaintiffs.

### TWELFTH CAUSE OF ACTION
**Fifth Amendment Takings Clause**
**(Fifth Amendment; 42 U.S.C. § 1983)**

154.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

155.    By making it illegal to possess items of personal property necessary for survival, now classified essentially as contraband, belonging to plaintiffs, the challenged ordinance authorizes seizure and, in some cases, destruction of personal property belonging to plaintiffs.

### THIRTEENTH CAUSE OF ACTION
**Right to Free Movement and Travel**
**(Article I, Sections 7 and 24 of the California Constitution)**

156.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

157.    Even before the adoption of the U.S. Constitution, residents of all states have "possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom . . . ." *United States v. Wheeler*, 254 U.S. 281, 293 (1920). The fundamental right to travel and to "peacefully dwell," although not explicitly

enumerated in the U.S. Constitution, has been consistently recognized by the courts and has been found to be embedded within the Commerce Clause and the Privileges and Immunities, Due Process, and Equal Protection Clauses of the Fourteenth Amendment. Although sometimes referred to in shorthand fashion as a "right to travel" or "right to freedom of movement," this fundamental right encompasses not only both intrastate and interstate travel, but also the right to remain, free from disturbance, in the place where one has arrived.

158.    Because the right of freedom of movement is a fundamental right, under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, any ordinance restricting exercise of that right is "presumptively invidious" and is invalid unless the government can prove the restriction has been "precisely tailored to serve a compelling governmental interest." *Plyler v. Doe*, 457 U.S. 202, 216–17 (1982).

159.    By requiring all who enter a homeless encampment, an abatement area in a public place, and all other charitable work in public spaces the Ordinance interferes with the right to move freely and is not precisely tailored to serve a compelling interest.

160.    INDIVIDUAL PLAINTIFFS and Members of the FREMONT HOMELESS UNION and CALIFORNIA HOMELESS UNION/STATEWIDE ORGANIZING COUNCIL in the City of Fremont must take rudimentary precautions to protect themselves from cold, rain, excessive heat, street violence, and other foreseeable dangers of involuntary homelessness. This means they have no choice but to use blankets, tents, tarps, to keep themselves safe, or sleep in their vehicles. This necessary conduct will result in criminal prosecution and arrest, as well as seizure and deprivation of survival gear.

161.    City of Fremont is therefore criminalizing involuntary conduct, that it knows or should know, is necessary for survival. Indeed, a December 17th staff report prepared for City of

Fremont's City Council stated, "The adoption of a camping ordinance … is not expected to reduce overall homelessness in the City of Fremont." It further noted "staff would seek to reallocate … resources as described in the HRP intended to prevent and reduce homelessness." Which is an admission that essentially all unhoused people in the City of Fremont are involuntarily homeless.

162.    Under Fremont Municipal Code 8.90.060(b) "Any person causing, permitting, aiding, abetting or concealing a violation of this chapter shall be guilty of a misdemeanor, and may be prosecuted as a misdemeanor and upon conviction be subject to a fine not to exceed $1,000.00 or imprisonment in the city or county jail for a period of not more than six months, or by both such fine and imprisonment.

163.    Beyond the direct criminalization of using rudimentary precautions against the elements, the City of Fremont criminalizes reciprocal acts of mutual aid by the homeless, and charity and assistance from religious organizations, that members of the FAITH IN ACTION EAST BAY, PAX CHRISTI NORTHERN CALIFORNIA, and plaintiffs the sincerely held religious beliefs of MS. HOFF, MS. GRIFFITH.

164.    It also interferes with FREMONT HOMELESS UNION, CALIFORNIA HOMELESS UNION, MARIN COUNTY HOMELESS UNION engaging in projects of survival and engaging in mutual aid and exchange of survival gear among members.

165.    The "aids" "abets" "conceals" language of Section 8.90.060 must be considered within the framework of California criminal law and procedure. As set forth by the Criminal Jury Instructions of the Judicial Council of California:

166.    "Someone aids and abets a crime if **(1)** the perpetrator committed the crime **(2)** the defendant knows of the perpetrator's unlawful purpose **(3)** before or during the crime

PAGE 46

commission of the crime does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime; and **(4)** The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime." See Cal Crim 401, Judicial Council of California Criminal Jury Instructions (2024 edition)

167.    Therefore, under the law, if a (1) involuntarily homeless person sleeps outside in a blanket, tent, or other "camping paraphernalia" that "constitutes camping"(2) knows a homeless person intends to use a tent, sleeping bag, or blanket on public or private (2) intends to help the homeless person stay warm at night by providing a tent, sleeping bag or blanket (3) actually does give a homeless person a tent, sleeping bag, or blanket (4) the homeless person uses those items for camping on public or private party – will be guilty of a misdemeanor punishable up to six months in jail.

168.    ORGANIZATIONAL PLAINTIFFS and their members engage in conduct of sharing tents, sleeping bags, blankets, food, water, and other forms of property when their members  (1) know unhoused people who use tents, sleeping bags, and blankets survive living outside in the City of Fremont (2) know the people they give survival gear intend to use those items on public or private property (3) and know they do use that survival gear and place it on public or private property will be subject to criminal prosecution.

169.    ORGANIZATIONAL PLAINTIFFS and their members will constitute "aid and abetting" and be subject to criminal prosecution to up to six months for providing mutual aid and assistance necessary for the survival. If one of their members give any homeless people property that they know the homeless people will possess for any duration, they will be subject to criminal prosecution.

170.    INDIVIDUAL PLAINTIFFS who engage in acts of reciprocal obligation and sharing of resources among members of their encampment similarly face aiding and abetting charges for helping their neighbors rain-proof tents, share blankets, and other survival items.

## PLAINTIFFS PRAY AS FOLLOWS

1. That this Court issue a temporary restraining order, preliminary injunction, and permanent injunction halting implementation of Chapter 8.90 of Fremont's municipal code.

2. That the Court issue a Declaratory Judgement that Chapter 8.90 of Fremont's municipal code is unconstitutional and facially invalid.

3. That the Court award attorney fees and cost of suit.

4. That the Court provide other relief as it deems necessary and proper.

Dated: March 4, 2025

Respectfully Submitted,
/s/ Anthony D. Prince
General Counsel,
California Homeless Union/
Statewide Organizing Council
Law Offices of Anthony D. Prince

/s/ Andrea M. Henson,
Where Do We Go

Attorneys for Plaintiffs

## VERIFICATION

As Northern California Regional Director for the California Homeless Union/Statewide Organizing Council, I, Crystal Sanchez, verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint are true and correct.

Dated: March 4, 2025          /s/ Crystal Sanchez,

# Exhibit A

ORDINANCE NO. _____ - 2024

## AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF FREMONT ADOPTING CHAPTER 8.90 OF FREMONT MUNICIPAL CODE TO ADOPT A CAMPING ORDINANCE

WHEREAS, the City of Fremont ("City") is committed to protecting the life, health, and safety of its residents and all people within the geographical boundaries of the City; and

WHEREAS, some lands within the City are environmentally sensitive, which may be significantly damaged by unregulated human activity and lands not specifically developed for camping purposes could potentially pose significant health and safety hazards to people who make shelter or stay overnight in these areas; and

WHEREAS, the Council is committed to protecting the rights of individuals who cannot obtain shelter and to treating their personal property with respect and consideration; and

WHEREAS, the City currently provides shelter beds for people experiencing homelessness, which offer a place to sleep and supportive services including job programs, housing support, treatment for mental health conditions or substance abuse, and security; and

WHEREAS, the City engages in outreach work to build relationships with people experiencing homelessness, using a person-centered, compassionate approach to provide services tailored to each person's specific needs; and

WHEREAS, the City provides housing stability support, eviction protection, transitional housing, and supportive and permanent housing solutions to assist people with ending their homelessness; and

WHEREAS, the 2024 Point-in-Time Count administered by the County of Alameda Continuum of Care reported 614 people were experiencing unsheltered homelessness within the City; and

WHEREAS, City streets, sidewalks, and parks are intended for safe and sanitary shared use by a diverse community of users including businesses, government, and the general public for gathering, recreating, movement of people, maintenance, and cleaning, and are frequently used by people relying on a variety of mobility devices; and

WHEREAS, this activity has forced residents to walk in the street to pass encampments blocking City sidewalks and puts residents at risk of injury or death from vehicular traffic; and

WHEREAS, the sustained presence of people in the City's open space and waterways within the City has created unsafe, unsanitary, unhealthy, and dangerous conditions including water pollution and frequent uncontained fires that threaten people living or using these areas, first responders, and the general public; and

WHEREAS, Fremont Fire indicates that fire crews respond to several fires each year suspected to have resulted from human activity related to homelessness; and

WHEREAS, people sheltering along riverbeds and flood control channels within the City are at risk of experiencing flooding, vector-related disease and other health issues, and these areas often contain sensitive environments at risk of significant damage by unregulated human activity; and

WHEREAS, the City counted approximately 223 encampments in 2022/2023 and collected over 409 tons of trash; and

WHEREAS, the City is obligated to protect public health and safety and its natural resources by maintaining clean, safe, and accessible City properties for all residents to enjoy, including parks, open space, and the public right of way; and

WHEREAS, to mitigate risks to the health and safety of the general public and potential damage to environmentally sensitive lands, the Council desires to enhance the City's authority to disband encampments regardless of the availability of shelter, due to the health and safety risk to those engaged in that activity, the general public, and the environment; and

WHEREAS, it is the intent of this Ordinance to prohibit camping, sleeping, and maintenance of encampments within the City while encouraging people experiencing homelessness to use available low barrier shelters and access a variety of services available from the City and its partners; and

WHEREAS, when abating any encampment, the City will provide written notice in advance of the cleared location that explains when the encampment will be cleaned up and how an individual can reclaim items stored during the process; and

WHEREAS, the City will store any personal property that may belong to a person, has apparently utility in its current condition and can be safely retrieved from the site, but will not store property that is broken, hazardous, contraband, or listed on the City's current list of common items regularly abandoned during the abatement process.

NOW, THEREFORE, THE CITY COUNCIL OF THE CITY OF FREMONT DOES ORDAIN AS FOLLOWS:

SECTION 1. FMC CHAPTER 8.90 ADDED

Chapter 8.90 Camping on Public Property of Fremont Municipal Code Title 8 Health and Safety, is added to read as follows:

**Sec. 8.90.010    Purpose.**

The purpose of this chapter is to maintain streets, parks and other public and private areas within the city in a clean, sanitary and accessible condition and to adequately protect the health, safety

and public welfare of the community, while recognizing that, subject to reasonable conditions, camping and camp facilities associated with special events can be beneficial to the cultural and educational climate in the city. The use of streets and public areas within the city for camping purposes or for storage of personal property interferes with the rights of the public to use these areas for which they were intended. Such activity can constitute a public health and safety hazard that adversely impacts residential neighborhoods and commercial areas. Camping without the consent of the owner and proper sanitary measures adversely affects private property rights, public health, safety, and welfare of the city. Nothing in this chapter is intended to interfere with otherwise lawful and ordinary uses of public or private property.

### Sec. 8.90.020    Definitions.

Unless the particular provisions or the context otherwise requires, the definitions contained in this section shall govern the construction, meaning, and application of words and phrases used in this chapter.

(a) "Camp" means to place, pitch or occupy camp facilities; to live temporarily in a camp facility or outdoors; or to use camp paraphernalia.

(b) "Camp facilities" include, but are not limited to, tents, huts, vehicles, vehicle camping outfits or temporary shelter.

(c) "Camp paraphernalia" includes, but is not limited to, bedrolls, tarpaulins, cots, beds, sleeping bags, hammocks or cooking facilities and similar equipment.

(d) "City manager" means the city manager or designee.

(e) "Establish" means setting up or moving equipment, supplies or materials on to public or private property to "camp" or operate camp facilities.

(f) "Maintain" means keeping or permitting equipment, supplies or materials to remain on public or private property in order to camp or operate camp facilities.

(g) "Operate" means participating or assisting in establishing or maintaining a camp or camp facility.

(h) "Park" means any park or recreation area used by the public and regulated under Chapter 12.20 of this code.

(i) "Private property" means all private property including, but not limited to, streets, sidewalk, alleys, and improved or unimproved land.

(j) "Public property" means all public property including, but not limited to, streets, sidewalks, alleys, improved or unimproved land and parks.

(k) "Store" means to put aside or accumulate for use when needed, to put for safekeeping, to place or leave in a location.

(l) "Street" means the same as defined in Section 18.25.2730 of this code.

### Sec. 8.90.030    Camping, locations prohibited; protection of waterways.

(a) Camping. It is unlawful for any person to camp or to maintain an encampment in or upon any public property, including any street, sidewalk, park, open space, waterway, or banks of a waterway, or any private property not designated and equipped for such camping. Additionally, it is unlawful for any person to camp or maintain an encampment in or upon any land designated as a high fire risk area. This section is not intended to prohibit camping on private residential property by friends or family of the property owner, so long as the owner consents and the overnight camping is limited to not more than three consecutive nights.

(b) Waterways. It is unlawful for any person to do any of the following:

1. Build or erect a structure of any type along the banks of any waterway, or drive a nail or other object into any tree or other natural area vegetation for the purpose of building an encampment or any other structure, or to affix an object to any tree or other natural vegetation;

2. Move boulders or large rocks, destroy vegetation, paved roads or paths created by the city, or otherwise reconfigure the natural landscape in the parks, waters of or along the banks of a waterway;

3. Drive, park, or bring any vehicle along the banks of a waterway, except in places specifically provided and designated for vehicular use;

4. Dig on the banks of a waterway; or

5. Discharge or store waste, including garbage, refuse, or human or animal waste, along the banks or into the waters of a waterway.

(c) Nothing in this section is intended to prohibit the activities of an owner of private property or other lawful user of private property that are normally associated with and incidental to the lawful and authorized use of private property; and nothing is intended to prohibit the activities of a lawful user if such activities are expressly authorized by the City Manager or by any law, regulation, permit, order or other directive from a regulatory authority.

### Sec. 8.90.040  Storage of personal property on public and private property.

(a) It is unlawful and a public nuisance for any person to store personal property, including camp paraphernalia, on any public property or any private property without the written consent of the owner, except as otherwise authorized in writing by the city.

(b) Moving personal property to another location upon public property or returning personal property to the same block of public property on a daily basis shall be considered storing and shall not be considered to be removing the personal property from public property. This definition shall not include any personal property that, pursuant to statute, ordinance, permit, regulation or other authorization by the city or state, is stored with permission of the city or state on real property that is owned or controlled by the city.

(c) No person shall store any personal property upon public property in such a manner as to obstruct city operations, including street or sidewalk maintenance or cleaning, or park or landscaping maintenance, repair or irrigation. Without prior notice, the city may temporarily move personal property, whether attended or unattended, which is obstructing city operations upon public property during the time necessary to conduct the city operations.

(d) No person shall store any personal property upon public property in such a manner that it does not allow for passage as required by the Americans with Disabilities Act of 1990 as amended from time to time (ADA). Without prior notice, the city may move and may immediately impound any personal property, whether attended or unattended, stored upon public property in such a manner that it does not allow for passage as required by ADA.

(e) No person shall store any personal property within ten feet of any operational and useable entrance, exit, driveway or loading dock. Without prior notice, the city may move and may immediately impound any personal property, whether attended or unattended, stored upon public property within ten feet of any such area.

(f) No person shall store any personal property upon public property that has clearly posted closure time, after the posted closure time. Without prior notice, the city may move and may immediately impound any personal property, whether attended or unattended, stored upon public property within ten feet of any such area.

### Sec. 8.90.050  Power of the city manager to make rules and regulations.

The city manager may adopt procedures for the removal and recovery of personal property left upon lands where camping is prohibited. Absent such procedures, personal property left upon lands where camping is prohibited for more than twenty-four hours may be removed by the city and may be recovered by the owner for up to ninety days.

### Sec. 8.90.060    Enforcement.

(a) Any person violating this chapter shall be subject to the following penalty:

1. Temporary seizure of personal property, as set forth at Section 8.90.040 of this chapter.

2. Prior to the city pursuing the remedy set forth at subsection (a)(1) of this section, the city shall provide the violator, orally or in writing, with information about housing support services. Nothing in this section or this chapter shall require the city to provide housing to such violator.

(b) Notwithstanding subsection (a) of this section:

1. Any person causing, permitting, aiding, abetting or concealing a violation of this chapter shall be guilty of a misdemeanor, and may be prosecuted as a misdemeanor and upon conviction be subject to a fine not to exceed $1,000.00 or imprisonment in the city or county jail for a period of not more than six months, or by both such fine and imprisonment.

2. Any violation of this chapter may be remedied by a civil action brought by the city attorney.

3. Violations of this chapter are hereby declared to be public nuisances subject to abatement by the city by any lawful means, including but not limited summary abatement procedures set forth in Chapter 8.60 of this code.

4. Any violation of this chapter is punishable as set forth in Title 1, General Provisions of this code.

(c) The remedies set forth in this chapter shall be cumulative and in addition to any and all other remedies, civil, equitable, or criminal, afforded to the city under the law.

(d) Nothing provided in this chapter shall create any duty on the city to enforce any specific law or code section or abate any specific condition or circumstance which may exist. The city shall exercise its discretion to enforce this chapter as resources permit.

(e) The timing, methods and priority of specific abatement actions shall be subject to the sole discretion of the city manager.

SECTION 2.    CEQA

The City Council determines, each on a separate and independent basis, the following sections of Title 14 of the California Code of Regulations apply and no further environmental review is required: (1) the California Environmental Quality Act (CEQA) Guidelines Section 15061(b)(3), in that the ordinance does not have the potential to cause a significant effect on the environment, and is not subject to CEQA review; (2) Furthermore, the project is exempt under CEQA Guidelines 15183, Projects Consistent with a Community Plan or Zoning, as the ordinance is consistent with the land use envisioned for the site as established by the General Plan for which an Environmental Impact Report (SCH#2010082060) was previously prepared and certified, and CEQA Guidelines Sections 15162 and 15163, as none of the circumstances requiring preparation of a subsequent or supplemental EIR have occurred; (3) CEQA Guidelines Sections 15304 as this ordinance is an action by the City that may result in a minor alteration to land, water, and/or vegetation; and (4) CEQA Guidelines Sections 15307 and 15308 as this ordinance is an action by the City for the protection of birds and other wildlife and the environment in City public lands, parks and waterways. The Council therefore directs that a Notice of Exemption be filed with the Alameda County Clerk in accordance with the CEQA guidelines.

SECTION 3. SEVERABILITY

If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason held by a court of competent jurisdiction to be invalid, such a decision shall not affect the validity of the remaining portions of this Ordinance. The City Council of the City of Fremont hereby declares that it would have passed this Ordinance and each section or subsection, sentence, clause and phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses or phrases be declared invalid.

SECTION 4. EFFECTIVE DATE

This Ordinance shall take effect and will be enforced thirty (30) days after its adoption.

SECTION 5.    PUBLICATION AND POSTING

The City Attorney has prepared a summary of this ordinance under Government Code Section 36933(c). The City Clerk has caused the summary to be published once in a newspaper of general circulation printed and published in Alameda County and circulated in the City of Fremont for at least five days before the date of adoption. A certified copy of the full text of the ordinance was posted in the office of the City Clerk, since at least five days before this date of adoption. Within 15 days after adoption of this ordinance, the City Clerk shall cause the summary to be published again with the names of those City Council members voting for and against the ordinance and shall post in the office of the City Clerk a certified copy of the full text of this adopted ordinance with the names of those City Council members voting for and against the ordinance.

* * *

The foregoing ordinance was introduced before the City Council of the City of Fremont at the regular meeting of the City Council, held on the _____ day of _____, and finally adopted at a regular meeting of the City Council held on the _____ day of _____, by the following vote:

AYES:

NOES:

ABSENT:

ABSTAIN:

_____
Mayor

ATTEST:                                    APPROVED AS TO FORM:


_____            _____
City Clerk                                 City Attorney