ANTHONY D. PRINCE, SBN 202892
GENERAL COUNSEL, CALIFORNIA HOMELESS UNION
LAW OFFICES OF ANTHONY D. PRINCE
2425 Prince Street, Ste. 100
Berkeley, CA 94705
Telephone: (510) 301-1472
Email: princelawoffices@yahoo.com

ANDREA M. HENSON, SBN 331898
WHERE DO WE GO
2726 Martin Luther King Jr. Way
Berkeley, CA 94703
Telephone: (510) 640-7390
Email: ahenson@wdwg.org

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA HOMELESS UNION, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF FREMONT, <br><br> Defendant. | **Case No.:** <br><br> **DECLARATION OF JAMIE CHANG, PhD IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

*California Homeless Union, et al. v. City of Fremont*
Declaration of José Arroyo

1. I, **Dr. Jamie Chan**, declare as follows.

2. I have personal knowledge of all facts in this declaration and if called to testify could and would do so competently.

3. I am a professor of medical sociology at University of California, Berkeley. I have a Ph.D. in Medical Sociology at the University of California, San Francisco, along with post-doctoral research training in substance use treatment programs. I have conducted drug/alcohol treatment research with County Departments of Public Health, Veterans Affairs hospitals, hospitals/clinics, community-based organizations, and grassroots organizations throughout the Bay Area.

4. My research involves investigating the structural determinants that impact the health of unhoused people, focusing on the role of social policies (e.g. anti-homeless ordinances, criminalization of homelessness, encampment sweeps, etc.) on unhoused people's health outcomes. Most recently, I have led mixed-methods studies which examine the soaring numbers of people dying while unhoused in Santa Clara County. My lab developed a website -- SCC Unhoused Death --  (link is external) as a research tool to track unhoused people's deaths in Santa Clara County.

5. I have extensive research experience in the impact of social policies and encampment sweeps on the health of unhoused people and have published numerous peer review studies in various academic journals. Attached hereto as Exhibit A is a partial list of some of the relevant research I have led and published.

6. Besides conducting medical-sociological research on the impacts of state sanctioned violence against unhoused people, I have also as part of my researched the historical context of these types of laws and have carefully researched the history of anti-homeless laws.

7. For the purposes of this declaration, I refer to "anti-camping" as "anti-homeless" "criminalization of survival" or other terms. The reason I do this is term "anti-camping" is an inaccurate way to describe these ordinances. Unsheltered people do not "Camp", rather they reflexively engage in acts of survival and possess survival gear – such as use blankets to stay warm, erecting shelter to protect themselves from wind and rain, and possessing other property necessary for survival.

8. Fremont's ordinance does not criminalize camping *per se* (*See*, Sec 8.90.030 City of Fremont Municipal Code: "This section is not intended to prohibit camping on private residential property by friends or family of the property owner"). Rather, it exclusively criminalizes a variety of reflexive acts of biological survival for unsheltered people who don't have access to private real property – such as using a blanket to stay warm, possessing bottles of water or other property that is "stored" on public property, or a having a tent to keep oneself and one's property safe from wind, rain, and theft.

9. Calling reflexive survival strategies "camping" and survival gear "camping paraphernalia" does not accurately reflect the necessity, and reflexive nature, of these acts of survival.

10. Accordingly, Fremont's ordinance is not an anti-camping ordinance – it is an anti-homeless ordinance insofar as it criminalizes reflexive survival strategies and the possession of survival gear while allowing property owners to continue to "camp" on their own property.

11. Based on my training and experience, I can authoritatively state the scientific consensus is that laws like the City of Fremont's Chapter 8.90 increases rates of homelessness by prolonging and magnifying the suffering unhoused people experience and are a primary contributor to premature mortality among the unsheltered.

12. People experiencing homelessness who are un-sheltered have higher rates of chronic illness, comorbid chronic conditions, and mortality due to chronic illness and injuries than their housed or sheltered counterparts. Jessica Richards & Randall Kuhn, *Unsheltered Homelessness and Health: A Literature Review*, 2 Am. J. Preventive Med. Focus, art. no. 100043, Mar. 2023, at 1, 8. When governments enforce anti-homeless laws without making adequate shelter available, enforcement "result[s] in adverse health outcomes, exacerbate[s] racial disparities, and create[s] traumatic stress, loss of identification and belongings, and disconnection from much-needed services." U.S. Interagency Counc. on Homelessness, 7 Principles for Addressing Encampments (June 2022) at 1. Studies demonstrate that this occurs through several mechanisms.

13. Numerous survey studies have shown that un-housed people's property is commonly confiscated or destroyed as a matter of procedure while enforcing anti-homeless laws. This occurs when a person is arrested and separated from their property or when police cordon off an area for sanitation workers to conduct camp clearances. This confiscation is a common practice in cities throughout the U.S. See Jennifer Darrah-Okike et al., *"It Was Like I Lost Everything": The Harmful Impacts of Homeless-Targeted Policies*, 28 Hous. Pol'y Debate 635, 635 (2018); Tony Robinson, *No Right to Rest: Police Enforcement Patterns and Quality of Life Consequences of the Criminalization of Homelessness*, 55 Urb. Affs. Rev. 41, 49 (2019); Chris Herring et al., *Pervasive Penalty: How the Criminalization of Poverty Perpetuates Homelessness*, 67 Soc. Problems 131, 131 (2020); J. L. Goldshear et al., *"Notice of Major Cleaning": A Qualitative Study of the Negative Impact of Encampment Sweeps on the Ontological Security of Unhoused People Who Use Drugs*, 339 Soc. Sci. & Med., art. no. 116408, Dec. 2023, at 1, 4.

14. For instance, a 2021 California study of 3,200 adults experiencing homelessness in eight counties across eight distinct regions found that 36 percent had their belongings taken or destroyed by

officials conducting abatements in the previous six months. Margot Kushel et al., *U.C.S.F. Benioff Homelessness & Housing. Initiative, Toward a New Understanding: The California Statewide Study of People Experiencing Homelessness* 65 (2023). By making mere possession of vital survival items of personal property a criminal offense, the City of Fremont's seizure, confiscation, deprivation and destruction of these belongings – now treated as contraband - will not be incidental to the enforcement of a law but is the purpose of the law, itself.

15. Studies have shown that people who are unsheltered are often trapped living in dangerous areas because those places are less likely to draw law enforcement attention. Spaces under freeways, alongside train tracks or waterways, or in industrial lots or abandoned properties are safer from police enforcement, but they also tend to be acutely hazardous areas with higher risk of vehicle-pedestrian strike, flooding, exposure to the elements, and pollution. Jamie Suki Chang et al., *Harms of Encampment Abatements on the Health of Unhoused* People, 2 Soc. Sci. & Med.— Qual. Res. Health, art. no. 100064, Dec. 2022, at 1, 4; C. J. Gabbe et al., Reducing Heat Risk for People Experiencing Unsheltered Homelessness, 96 Int'l J. Disaster Risk Ed., art no. 103904, Oct. 2023, at 1, 5–7; Erin Goodling, *Intersecting Hazards, Intersectional Identities: A Base-line Critical Environmental Justice Analysis of U.S. Homelessness*, 3 Env't & Plan. E: Nature & Space 833, 833 (2020); Shawn Flanigan & Megan Welsh, *Unmet Needs of Individuals Experiencing Homelessness Near San Diego Waterways: The Roles of Displacement and Overburdened Service Systems,* 43 J. Health & Hum. Servs. Admin. 105, 109 (2020); Chris Herring, *The New Logics of Homeless Seclusion: Homeless Encampments in America's West Coast Cities*, 13 City & Cmty. 285, 291 (2014).

16. Accordingly, based on my training, experience and familiarity with the situation in the City of Fremont, i.e., the unhoused Plaintiffs in this case who live on the "Slab" situated by train tracks

and under a freeway overpass, are there as a result the City of Fremont's existing anti-homeless ordinances pushing people from safer locations into these more dangerous areas. If allowed to take effect, the Ordinance will dramatically escalate this process.

17. Anti-homeless laws and their enforcement also tend to push people further from various health and medical-related resources they rely on, including healthcare providers, food and water, and hygiene resources such as toilets and laundromats. Elizabeth A. Frye et al., *Open Defecation in the United States: Perspectives from the Streets*, 12 Env't Just. 226, 226 (2019); Qi et al., supra, at 3707.

18. Following the passage of a new anti-homeless ordinance in Denver, homeless people reported living in more isolated conditions to avoid police. Enforcement dislocated unhoused people from social support systems critical to survival and health, resulting in higher rates of assault and worse mental health outcomes, among other consequences. Marisa Westbrook & Tony Robinson, *Unhealthy by Design: Health & Safety Consequences of the Criminalization of Homelessness*, 30 J. Soc. Distress & Homelessness 107, 107 (2021).

19. **B. Enforcing anti-homeless laws can inflict prolonged sleep deprivation, which can worsen mental health.**

20. Adequate sleep is essential to health and well-being. Studies have documented that people experiencing homelessness get less sleep and experience increased daytime fatigue and unintentional sleep during the daytime. Ariana Gonzalez & Quinn Tyminski, Sleep Deprivation in an American Homeless Population, 6 Sleep Health 489, 489 (2020). On its face, the City of Fremont Criminalization plays a large role in this; laws like Grants Pass's scheme necessitate constant movement.

21. At night, unsheltered homeless people must contend with the cold, exposure to the elements, and maintaining their personal safety in the dark and marginal locations where, as discussed above, they are forced to sleep. Meanwhile, people staying in congregate shelters also often struggle to obtain adequate sleep due to noise levels, overcrowding, lack of privacy, anxiety, theft, and fears about personal safety. Many, if not most, shelters in the U.S. are closed during daytime hours, forcing shelter residents to spend much of their daytime hours in public spaces.

22. Thus, homeless people struggle to attain adequate sleep even in jurisdictions that only enforce anti-homeless laws during daylight hours, and even homeless people who have a shelter bed may find themselves caught up in the enforcement net.

23. People experiencing homelessness most often experience incarceration in two scenarios: (1) an arrest for violating an anti-homeless law, or (2) an arrest on a bench warrant due to unpaid civil citations for violating an anti-homeless law. Incarceration for more than a couple of days may result in the termination of federal health benefits such as Social Security, Medicare, or Medicaid, or loss of a shelter bed. Chris Koyanagi et al., Bazelon Ctr. for Mental Health L., *Arrested? What Happens to Your Benefits If You Go to Jail or Prison?* (2006); Herring, Cruel Survival, supra, at manuscript 115. For people with mental health disorders, the alternately rigid and chaotic jail environment can be especially challenging, and research has found high levels of destabilization and decompensation while incarcerated. Dora M. Dumont et al., Public Health and the Epidemic of Incarceration, 33 Ann. Rev. Pub. Health 325, 329 (2012). The result is often an increase in symptoms of trauma, anxiety, depression, and psychosis, both while in jail and after release.

Kristin Turney et al., As Fathers and Felons: Explaining the Effects of Current and Recent Incarceration on Major Depression, 53 J. Health Soc. Behav. 465, 465–66 (2012).

24. Fremont's newest anti-camping ordinance includes an aiding abetting provision is under Section 8.90.060 unprecedented. Although I have studied many anti-homeless laws, I have not found a law like this that criminalizes acts of charity or mutual aid among people experiencing homelessness. However, it poses a major threat to their survival because it criminalizes the essential aid they receive from the larger community and each other.

25. As people are cycled from neighborhood to neighborhood by law enforcement, it becomes increasingly challenging for them to maintain these ties that are necessary to sustain themselves and escape homelessness. Punishment schemes like the one in City of Fremont that force people to not only switch neighborhoods but to leave an entire city or region have even more severe impacts.

26. There are numerous examples of communities that have used an encampment resolution approach without enforcement, as recommended by the guidelines, to achieve progress on the dual goals of securing housing for unsheltered residents and removing encampments from public space. *Moving Inside: State Encampment Resolution Initiative at Work in King County,* King County Regional Homelessness Authority (Feb. 8, 2024), https://kcrha.org/news-moving-insidestate-encampment-resolution-initiative-at-work-in-kingcounty/; Stephen Metreux et al., Univ. Pa., An Evaluation of the City of Philadelphia's Kensington Encampment Resolution Pilot 5 (Mar. 5, 2019); Samantha Batko et al., Urb. Inst., *Alternatives to Arrests and Police Responses to Homelessness: Evidence-Based Models and Promising Practices 1* (Oct. 2020).

27. In conclusion, based on my experience, training, research and familiarity with the specifics of the state of homelessness in the City of Fremont, it is my professional medical opinion that the

*California Homeless Union, et al. v. City of Fremont*
Declaration of Jamie Chang, PhD

- 8

newly-enacted "anti-camping" (in truth, anti-homeless) ordinance serves no legitimate penological purpose and will result in irreparable injury and avoidable premature deaths of unhoused persons and should not be allowed to take effect.

I swear under penalty of perjury under the laws of the United States that the foregoing is a true statement based on personal knowledge.

Dated: March 2, 2025                                          /s/ Jamie Suki Chang, PhD

Executed at Berkely, CA

*California Homeless Union, et al. v. City of Fremont*
Declaration of Jamie Chang, PhD

- 9